UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

DANA RACHLIN,

Plaintiff,

-against-

THE CITY OF NEW YORK, MAYOR OF THE CITY OF
NEW YORK ERIC ADAMS, NYPD COMMISSIONER
DERMOT SHEA, NYPD COMMISSIONER
KEECHANT SEWELL, NYPD COMMISSIONER
EDWARD CABAN, NYPD CHIEF OF DEPARTMENT
JEFFREY MADDREY, NYPD COMMUNITY
COORDINATOR BRIAN ADAMS, NYPD CHIEF OF
PATROL JOHN CHELL, NYPD INSPECTOR CRAIG
EDELMAN, NYPD DEPUTY DIRECTOR KAZ
DAUGHTRY, DEPUTY COMMISSIONER OF
COLLABORATIVE POLICING CHAUNCEY
PARKER, and NYPD MEMBERS JOHN or JANE
DOE # 1 – 5,

Defendants.

------------------------------------------------------------------------X

**VERIFIED**
**COMPLAINT**

Index No.:

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff, **DANA RACHLIN**, by her attorneys, **KAISHIAN & MORTAZAVI LLC**, by

**MARYANNE K. KAISHIAN, ESQ.,** an attorney duly licensed to practice before the United

States District Court for the Eastern District of New York, hereby complains of Defendants as

follows:

## PRELIMINARY STATEMENT

1.      On October 17, 2017, Plaintiff Dana Rachlin ("Plaintiff" or "Ms. Rachlin"), a

resident of Kings County, was sexually assaulted by an acquaintance. She reported the rape to the

New York City Police Department (NYPD) at the urging of Defendant Chief of Department Jeffrey

Maddrey, then the Commanding Officer of Patrol Borough Brooklyn North.

2.      Four years after Ms. Rachlin's traumatic assault, she was re-victimized by members

of the NYPD in multiple acts of retaliation for engaging in constitutionally protected conduct,

including her association with community members through her organization and publicly criticizing the promotion of abusive NYPD members within the Department.

3.    Ms. Rachlin is the Executive Director of the nonprofit NYC Together and its subsidiary We Build the Block, which she cofounded with her partner, the late actor and community advocate Michael K. Williams ("Mr. Williams").

4.    Despite a history of conducting joint community events, planning initiatives, and otherwise working collaboratively with the NYPD both before and after her October 2017 sexual assault, Ms. Rachlin found herself openly at odds with high-level NYPD officials in 2020 over instances of violent policing by members of the Department, including Defendant Craig Edelman.

5.    Following a well-documented series of such issues, Defendant NYPD Members widely disseminated Ms. Rachlin's private information, including her home address, the race of her assailant, and the fact that she had reported her 2017 rape to the Department, alongside demonstrably false and defamatory accusations against her.

6.    These communications included multiple defamatory statements, including the spurious and harmful claim that Ms. Rachlin had lied about being raped.

7.    These defamatory claims were shared with elected officials, Mr. Williams, current and prospective community partners of We Build the Block, residents of the 61st Precinct in Kings County, and faith leaders; including through the circulation of libelous letters and memos bearing Ms. Rachlin's image and home address. *See* **Exhibit 1**, 61st Precinct Letter, and **Exhibit 2**, NYPD 49-Format Memo.

8.    Defendant City and its policymakers have fostered a system in which sexual assault victims not only have their cases mishandled by the Department but in which these victims, such

as Plaintiff, are subjected to further harm, including through the misappropriation of their personal information for retaliatory purposes by Department members.

9.      Plaintiff now brings the instant Complaint for, *inter alia*, First Amendment retaliation, defamation, due process violations, and discrimination against a victim of a sexual offense before this Court.

## PARTIES

10.     **PLAINTIFF DANA RACHLIN** is, and was at all times relevant, a resident of Kings County, City and State of New York.

11.     At all relevant times mentioned herein, **DEFENDANT CITY OF NEW YORK ("Defendant City" or "New York City")**, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

12.     **DEFENDANT NEW YORK CITY MAYOR ERIC ADAMS ("Defendant Mayor")** was at all times relevant to this Complaint the Mayor of New York City. As Mayor, Defendant Mayor, at all relevant times, was an elected officer and the "chief executive officer of the city," New York City Charter § 3, and had final authority to appoint and/or remove any NYPD employees and agents, including the New York City Police Commissioner. As Mayor, Defendant Eric Adams may, with the consent of the district attorney, also increase or decrease the number of positions within the district attorney's office. New York County Law § 931. He is sued individually and in his official capacity.

13.     **DEFENDANT FORMER NYPD COMMISSIONER DERMOT SHEA ("Defendant Shea")** was, at all relevant times to this Complaint from November 4, 2019, through

December 31, 2021, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

14.     **DEFENDANT FORMER NYPD COMMISSIONER KEECHANT SEWELL ("Defendant Sewell")** was, at all times relevant to this Complaint from January 1, 2022, through June 12, 2023, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Sewell, personally and/or through her authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. She is sued individually and in her official capacity.

15.     **DEFENDANT NYPD COMMISSIONER EDWARD CABAN ("Defendant Caban")** is, and was at all times relevant to this Complaint after June 12, 2023, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Caban, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

16.    **DEFENDANT NYPD CHIEF OF DEPARTMENT JEFFREY MADDREY** (**"Defendant Maddrey"**) was, at all relevant times, a supervisor and policymaker within the NYPD. Prior to December 2, 2022, Defendant Maddrey was the NYPD's Chief of Community Affairs and Chief of Housing before being promoted to Chief of Patrol. On December 2, 2022, Defendant Maddrey was promoted again to Chief of Department. In these roles, at all relevant times, Maddrey had policymaking authority over the Department. At all relevant times, Defendant Maddrey had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

17.    **DEFENDANT NYPD CHIEF OF PATROL JOHN CHELL** (**"Defendant Chell"**) was, at all relevant times, a supervisor within the NYPD. From May 3, 2019, through December 2, 2022, Defendant Chell was a First Deputy Chief with the NYPD. Beginning on or about December 2, 2022, Defendant Chell was promoted to Chief of Patrol of the NYPD. At all relevant times, Defendant Chell had policymaking authority over the Department. At all relevant times, including as Deputy Chief and Chief of Patrol, Defendant Chell had primary responsibility for NYPD patrol operations. NYPD uniformed members of the service were obligated to obey any lawful order given by Defendant Chell. He is sued individually and in his official capacity.

18.    **DEFENDANT NYPD COMMUNITY COORDINATOR BRIAN ADAMS** (**"Defendant Brian Adams"**) was, at all relevant times, the Community Coordinator for the NYPD. As Community Coordinator, Defendant Brian Adams was responsible for daily administrative decision-making and personnel assignments, discipline, training, reporting, and

supervision of certain NYPD employees within his control. Defendant Adams had policymaking authority for the City. He is sued individually and in his official capacity.

19.     Defendant **NYPD DEPUTY INSPECTOR CRAIG EDELMAN ("Defendant Edelman")** was, at all relevant times, a supervisor and Deputy Inspector within the New York City Police Department. As an NYPD supervisor, Defendant Edelman was a City policymaker who was responsible for enforcing administrative and managerial policies and procedures, including NYPD policies and applicable laws and regulations, for the individual NYPD members under his supervision. Defendant Edelman was responsible for daily administrative decision-making and personnel assignments, discipline, training, reporting, and supervision of the lower-ranking members of the NYPD within his control. He is sued individually and in his official capacity.

20.     **DEFENDANT DEPUTY COMMISSIONER OF OPERATIONS KAZ DAUGHTRY ("Defendant Daughtry")** is, and has been since 2023, the NYPD's Deputy Commissioner of Operations. As Deputy Commissioner of Operations, Defendant Daughtry, on behalf of the Defendant City of New York, is responsible for monitoring ongoing critical situations, demonstrations and protests, and other incidents deemed news-worthy by Defendant City and/or its agents, and making policy and action recommendations to the Defendant Mayor, Defendant Commissioners, and/or Defendant Maddrey regarding the same, and acting as the NYPD's City Hall Liaison for the Defendant Mayor and his Administration. From May 2020 through December 2022, Defendant Daughtry was a Detective Second Grade, and as such was responsible for the supervision, training, and day-to-day administrative decisions for lower-ranking NYPD members under his control; on December 23, 2022, Defendant Daughtry was promoted to Detective First Grade while tasked with leading the NYPD's "Community Affairs Bureau" and continuing his supervisory and policymaking roles; on July 17, 2023, Defendant

Daughtry was promoted again to Assistant Commissioner of Operations, making him the Liaison to City Hall and the Chief of Staff to Defendant Maddrey before his promotion to Deputy Commissioner of Operations. At all relevant times, Defendant Daughtry was an NYPD supervisor with decision-making and policy powers. As Assistant Commissioner and as Deputy Commissioner, Defendant Daughtry was and responsible for daily administrative decision-making, policymaking, making official NYPD communications, crafting and representing the positions of the Administration and NYPD to the public, and executing the directives of Defendant Mayor and Defendant Commissioners. He is sued individually and in his official capacity.

21. **DEFENDANT DEPUTY COMMISSIONER OF COLLABORATIVE POLICING CHAUNCEY PARKER ("Defendant Parker")** was, at all relevant times, a supervisor and policymaker within the NYPD. As Director of Collaborative Policing, Defendant Parker had significant control over the NYPD's partnerships with individuals, government agencies, and community-based organizations, including Plaintiff's, and was responsible for policymaking and directives on behalf of Defendant City regarding the same. He is sued individually and in his official capacity.

22. **DEFENDANT NYPD MEMBERS JOHN or JANE DOE # 1 – 5**, whose true identities are not yet known, are referred to herein collectively and fictitiously as "Defendant NYPD Does," or "Defendant Does # 1 – 5." At all relevant times these Defendants were employed by Defendant City as members of the NYPD.

23. At all times hereinafter mentioned, all individual Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

24.     Each and every act and omission by the individual Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

25.     The individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

26.     All Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

27.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

28.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants take any steps to intervene in, the abusive and/or constitutionally and legally deficient conduct of their colleagues.

29.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority.

30.     Each individual Defendant is sued in her or his individual and official capacities.

<u>**JURISDICITON AND CONDITIONS PRECEDENT**</u>

31.     This Court has jurisdiction of this action pursuant to <u>28 U.S.C. §§ 1331</u>, <u>1343</u>, <u>1367</u>, and <u>42 U.S.C. § 1983</u>.

32.     Venue is proper, pursuant to <u>28 U.S.C. § 1391</u>, *et seq.*, in the Eastern District of New York, where a majority of the actions complained of herein occurred.

33.     The monetary damages amount sought by Plaintiff exceeds $150,000.00.

34.     <u>New York State General Municipal Law § 50</u> does not govern Plaintiff's claims brought pursuant to <u>NYC Admin. Code §§ 8-107 and 10-1104</u>.

35.     Plaintiff has met all conditions precedent for proceeding with her claims under Federal and City law.

36.     Plaintiff brings the instant Complaint within three years of the accrual of all claims in accordance with applicable law.

<u>**BACKGROUND**</u>

***The Mistreatment of Gender-Based Violence Victims by the NYPD***

37.     In 2018, The New York City Council introduced a host of bills that mandated sexual sensitivity and assault investigation training for members of the NYPD in the wake of information about the Department's treatment of sexual assault victims.[1] However, at a Council hearing in 2021, it was clear that these issues persisted.[2]

38.     The Defendants have been on notice about sexual misconduct by NYPD members and the need for training and discipline around these harms for years but have failed to address

---

[1] *See* New York City Council (October 18, 2021) *Joint Hearing with Women and Equity and Public Safety*, minutes and video available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=896997&GUID=54E40D2E-C083-4B1B-AB17-1328C10A783E&Search=; *see also*, John del Signore, *NYPD Cop Accused of Groping His "Favorite Rape Victim,"* GOTHAMIST, January 16, 2015, *available at*: https://gothamist.com/news/nypd-cop-accused-of-groping-his-favorite-rape-victim.
[2] *Id.*

these issues in any meaningful way. In fact, as in the case of Assistant Chief of NYPD Christopher McCormack, members who are accused of sexual misconduct often rise through the ranks.[3] McCormack has been accused by more than a dozen people of humiliating and abusive sexual conduct, including public strip searches and forcibly inserting his fingers into their anal cavities during legally prohibited "searches."[4]

39. In 2018, the Civilian Complaint Review Board (CCRB) announced that the scope of the problem of sexual misconduct including assault by members of the NYPD necessitated an expansion of CCRB rules to allow the independent oversight agency to investigate such complaints, and the CCRB Board adopted this change by unanimous vote in February 2018.[5]

40. For decades the CCRB had referred all sexual misconduct cases to the NYPD's Internal Affairs Bureau (IAB), requiring victims of NYPD-related sexual abuse to interface entirely with the NYPD itself, and no information about any investigations, discipline, or outcomes were made public.

41. Indeed, Ms. Rachlin has filed two Freedom of Information Law requests since 2022 seeking the release of the IAB file in her case, but the file and related records have not been disclosed. In 2023, the NYPD's Legal Bureau indicated that the IAB investigation into the matter was ongoing. To date, Ms. Rachlin has not been contacted by any investigators.

---

[3] *See* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him*. PROPUBLICA, Sept. 10, 2020, *available at:* propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him.
[4] *Id*.
[5] New York City Civilian Complaint Review Board, *NYC Civilian Complaint Review Board Votes Unanimously to Investigate Allegations of NYPD Sexual Misconduct*, via Press Release (February 15, 2018) available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/news/pressreleases/2018/20181502_boardmtg_sexualmisconduct_release.pdf.

42.     The NYPD's Patrolmen's (or Police) Benevolent Association also moved to block the CCRB's expansion.[6] Ultimately, after reintroducing the proposed rules in a manner consistent with the First Department's holding in *Lynch v Civilian Complaint Review Board*,[7] the agency officially undertook these investigations in December 2020. Plaintiff incorporates by reference the information contained in the Civilian Complaint Review Board's data regarding the agency's investigations.[8]

43.     According to information provided at the CCRB's public Board Meeting on December 8, 2021, between the time investigations were initiated and the presentation at the December 8th meeting, the CCRB had received 233 complaints within its jurisdiction that included 335 allegations of sexual misconduct by members of the NYPD and had referred 384 sexual misconduct cases to the IAB and District Attorneys for potential employment-related and criminal actions.[9]

44.     On June 30, 2022, the US Department of Justice announced that it was initiating an investigation into the NYPD's mishandling of sexual assault investigations and the mistreatment of the victims of gender-based violence by the Department, including the Special Victims Division (SVD).

45.     This announcement came after numerous victims of sexual assault whose cases had been mishandled by the NYPD and who had been mistreated when attempting to pursue their claims with the Department sent a letter describing their ordeals to the DOJ.

---

[6] *Matter of Lynch v New York City Civilian Complaint Review Bd.*, 2020 NY Slip Op 03062 (1st Dept 2020).
[7] *Id.*
[8]  New York City Civilian Complaint Review Board (December 8, 2021) *December 8, 2021 Public Board Meeting*, minutes available at:
https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2021/Minutes/12082021_boardmtg_minutes.pdf
[9] December 8, 2021, CCRB Meeting Minutes at 25.

46. The DOJ determined that the documented history of these issues within the NYPD necessitated the "comprehensive review of the policies, procedures and training for SVD investigations of sexual assault crimes, including how SVD interacts with survivors and witnesses, collects evidence and completes investigations; any steps NYPD has taken to address deficiencies in its handling of sexual assault crimes; how SVD allocates staffing and other resources; and the services and support offered to survivors of sexual assault."

## STATEMENT OF MATERIAL FACTS

47. Ms. Rachlin is the Executive Director of NYC Together, a foundation that provides services and care to young people who are at an increased risk of violence and other deleterious effects borne of poverty, lack of resources, and the absence of meaningful support. Ms. Rachlin is also a survivor of gender-based violence.

48. Ms. Rachlin is also employed as the Associate Director of Precinct & Community Initiatives at the John Jay College Punishment to Public Health Department.

49. Participants in Ms. Rachlin's programs are often the same individuals targeted and/or identified for criminal enforcement by police.

50. Ms. Rachlin's model for the NYC Together program initially relied upon cooperation from the NYPD in serving young people in the program, particularly for identification of at-risk individuals for connection to necessary services.

51. Ms. Rachlin's stated goal was to shift the emphasis of policing from stop-and-frisk tactics to an emphasis on non-criminalized engagement referred to as "community-led policing."

52. This relationship was considered essential given the NYPD's extensive history of identifying—both indirectly, by cataloguing, and directly, by criminalizing—young Black and brown men who had engaged in and/or been personally affected by violence.

53.     Ms. Rachlin's goal was to redirect these young people to meaningful assistance rather than additional violence, including at the hands of police.

54.     For the period between approximately 2016 and 2020, including through her supervision and operation of NYC Together, Ms. Rachlin developed an active system of collaboration and open dialogue with several high-ranking members of the NYPD.

55.     These members included the NYPD's Chief Maddrey.

### *Plaintiff's 2017 Sexual Assault*

56.     On or about October 17, 2017, Ms. Rachlin was the victim of a sexual assault by an acquaintance after an event attended by multiple members of the NYPD, including Defendant Maddrey and Defendant Daughtry.

57.     Following the assault, Defendant Maddrey met Ms. Rachlin at the hospital and was allowed into the recovery room.

58.     Defendant Maddrey urged Ms. Rachlin to report the assault to the Department over her hesitancy.

59.     Ms. Rachlin was initially hesitant to avail herself of the criminal legal system, believing that its ability to achieve justice for victims was limited and being generally opposed to the punitive and non-rehabilitative nature of incarceration.

60.     However, Defendant Maddrey encouraged Ms. Rachlin to proceed with filing a report.

61.     Defendant Maddrey assured Ms. Rachlin that the paperwork would be entered in a manner to protect her identity, using the pseudonym "Person Known to the Department," and further assured her that only Defendant Kaz Daughtry, then a detective, and two detectives from

NYPD SVD would handle the investigation.

62.     According to the NYPD, Ms. Rachlin's rape kit was consistent with sexual assault and was positive for male DNA. The NYPD did not conduct further testing on this DNA.

63.     At least one witness, also an NYPD member, informed the NYPD that, in the aftermath of the assault, the witness overheard Ms. Rachlin's assailant apologize to her for "what happened last night."

64.     On or about October 18, 2017, two members of the NYPD's Special Victims Unit arranged a controlled phone call between Ms. Rachlin and her assailant.

65.     During this call, Ms. Rachlin, at the Detectives' urging, remained on the phone with her assailant while he made various admissions, including acknowledging that she did not give consent, and he apologized repeatedly.

66.     Upon recording multiple statements that corroborated Ms. Rachlin's account, the Detectives indicated to Ms. Rachlin to end the phone call, and she complied.

67.     The Detectives then celebrated and indicated to Ms. Rachlin, in sum and substance, "We got him."

68.     However, during subsequent meetings with the Brooklyn DA's Office, Ms. Rachlin was informed, in sum and substance, that the NYPD had ended the controlled call prematurely.

69.     Ms. Rachlin was further counseled that the prosecution of any sexual assault allegation was likely to be a lengthy and emotionally draining process for the victim.

70.     Fearing additional humiliation and trauma, and even more skeptical about the criminal legal system's ability to achieve meaningful outcomes, Ms. Rachlin ultimately determined that she did not wish to pursue the charges against her assailant.

71.     The NYPD's paperwork indicates that Ms. Rachlin stated she did not wish to pursue the prosecution of her assailant, and that the same was communicated to Det. Weber by a prosecutor with the Brooklyn DA's Office.

72.     The NYPD paperwork further indicates that Ms. Rachlin was informed she may reopen the investigation at a future date, should she wish to. No further action was taken.

73.     The NYPD's case file indicates that the case was closed at Ms. Rachlin's request.

74.     Ms. Rachlin sought and received counselling and mental health resources for the trauma, anxiety, and fear caused by her assault and subsequent events.

75.     Ms. Rachlin did not publicize the details of her assault, did not seek civil damages against her assailant, and attempted to put the assault behind her as part of her healing process.

76.     Ms. Rachlin expanded her community work to specifically advocate for victims of gender-based violence, including by reaching out to the NYPD regarding related training and resources for survivors of gender-based violence.

### *2020 Conflict*

77.     In 2020, amidst and in response to the nationwide and local uprisings for racial justice, Ms. Rachlin and her partner Michael K. Williams ("Mr. Williams") founded We Build the Block, which operated as a subsidiary of, and now as a D/B/A, for NYC Together.[10] According to its Mission Statement:

> We Build the Block is a New York City-based organization bringing our community together to build the future of public safety. We create community-developed and led models proven to reduce violence and increase safety. Working with a broad coalition of partners, we support local youth, pilot new initiatives, and advocate for change. We believe that by replacing over-policing with solutions built on the block, we can protect and support our most vulnerable communities.[11]

---

[10] *See* We Build the Block: About Us, *available at* https://webuildtheblock.org/about-us/ (last visited April 5, 2024).
[11] *Id.*

78. The partners also founded Crew Count, a pro-social response to the NYPD's now-infamous gang policing initiative, Operation Crew Cut.[12] Crew Count's central mission is the political empowerment of young and marginalized New Yorkers, including through voter registration initiatives.[13]

79. These programs repeatedly demonstrated success in promoting positive outcomes for its young participants under their leadership.

80. Particularly from 2019 through 2020, Ms. Rachlin increasingly attempted to utilize her earned credibility by identifying NYPD members whose conduct had been particularly brutal toward young New Yorkers and requesting that they be precluded from posts that required routine engagement with young community members.

81. The violent conduct of one NYPD member in particular, Defendant Inspector Craig Edelman ("Defendant Edelman"), then the 73rd Precinct Commander, disturbed Ms. Rachlin, her program's participants, and her program's providers, as well as other community members and elected officials.[14]

82. On or about May 15, 2020, Defendant Edelman engaged in violent conduct on a public street in Brownsville, Brooklyn, including supervising and/or participating in an incident where police pepper sprayed several small children in the face.[15]

---

[12] Operation Crew Cut was a dragnet-style gang-policing initiative that devastated thousands of New Yorkers, particularly those in already-marginalized and aggressively policed communities. This devastation was wrought through raids such as the deadly and ineffectual "Bronx 120" raid, where roughly half of all people arrested were subsequently determined to not be gang-involved, and the vast majority faced no serious felony charges. *See, e.g.*, Olivia Heffernan, *We've Got One in the Sweep*, THE APPEAL, *We've Got One in the Sweep*, July 30, 2019, *available at* https://theappeal.org/weve-got-one-in-the-sweep/ (last visited April 5, 2024); *see also* K Babe Howell, *Gang Policing: The Post Stop-and-Frisk Justification for Profile-Based Policing*, 5 U. Denv. Crim. L. Rev. 1 (2015).
[13] *See* We Build the Block: Crew Count, *available at* https://webuildtheblock.org/about-us/ (last visited April 5, 2024).
[14] *See* Saki Knafo, *Bridging the Divide Between the Police and the Policed*, THE NEW YORKER, April 28, 2021, *available at* https://www.newyorker.com/news/our-local-correspondents/bridging-the-divide-between-the-police-and-the-policed (last accessed April 14, 2023).
[15] In an interview about the incident, Defendant Edelman stated, "Could children have gotten mace in their eyes? Unfortunately, yes." *Id.*

83.     In another incident, also in Brownsville, Assemblymember Latrice Walker and City Councilmember Alicka Ampry-Samuels witnessed NYPD Police Officer Vincent D'Andraia, with and under the supervision of Defendant Edelman, search and harass a person on a public street without cause. When the elected officials voiced concern over the NYPD members' conduct, Defendant Edelman justified the abuse, claiming, "They have to learn how to respect us."[16]

84.     The following month, Defendant Edelman supervised another violent incident in which D'Andraia threw a female Black Lives Matter protester to the ground, striking her head and causing a traumatic brain injury. Defendant Edelman is recorded watching the assault and failing to intervene or render any medical care. The lawsuit, which named Defendant Edelman, settled for $387,000.00. *See Zayer v City of New York, et al.*, 20-CV-06070 (S.D.N.Y.) (2021).

85.     Ms. Rachlin further observed Defendant Edelman viewing and sharing videos of shootings, police assaults, and other violence suffered by New York City residents while laughing and encouraging other members of the Department to watch the recordings for entertainment purposes.

86.     Ms. Rachlin repeatedly reported Defendant Edelman's behavior to high-ranking NYPD members, including Defendant Maddrey, Defendant Edelman's supervisor, and was increasingly concerned by Defendant Edelman's growing influence and apparent support within the Department.

87.     However, Defendant Edleman remained in his supervisory position in the 73rd Precinct and continued this harmful behavior.

88.     On June 5, 2020, then-Commissioner Defendant Shea was scheduled to appear on

---

[16] *See* Eileen Grench and Yoav Gonan, *NYPD Cop in Protester-Shoving Left Trail of Rough Policing Complaints in Brownsville*, THE CITY, June 19, 2020, *available at* https://www.thecity.nyc/2020/06/19/nypd-cops-in-protester-shoving-ccrb-complaints-brooklyn/ (last visited April 1, 2024).

the radio show *Ebro in the Morning* on Hot97 hosted by Ebro Darden ("Mr. Darden").

89.     The professional relationship between Mr. Darden and Ms. Rachlin was known to Defendants, including Defendants Maddrey and Edelman.

90.     Ms. Rachlin communicated to Mr. Darden ahead of this scheduled interview that Defendant Edelman remained on the NYPD and continued to pose a threat to New Yorkers, and that his appointment to a leadership position in the 73rd Precinct in Brownsville had been objected to by multiple elected officials and community members.

91.     During the interview, Mr. Darden asked Defendant Shea about the continued employment and advancement of Defendant Edelman in the Department.[17]

92.     After the broadcast interview, Defendant Shea immediately reassigned Defendant Edelman. Defendant Edelman was replaced by Deputy Inspector Terrell Anderson in the 73rd Precinct.

93.     Though the move was an elevation for Defendant Edelman within the Department, given his new role as a supervisor in the citywide Gun Violence Suppression Division, his transfer and replacement was understood to be disciplinary in nature and enraged other Defendants, including Defendant Chell and Defendant Edelman himself.

94.     These Defendants correctly deduced that Ms. Rachlin had informed Mr. Darden about the ongoing conflict regarding Defendant Edelman's assignment, an allegation that Ms. Rachlin did not refute.

95.     In texts sent to Ms. Rachlin on or about June 5, 2020, referencing the Hot97

---

[17] Mr. Darden asked, "Black police officers have come to you regarding the removal of Craig Edelman and Vincent D'Andraia. They feel ignored. What's going on there?" Defendant Shea responded, in relevant part, "No one is being ignored. I've had many conversations with elected officials and community leaders, about several incidents, including that one, and they will be thoroughly investigated promptly, and the appropriate measures will be taken. And if they are not, then that's on me." Full interview available at: https://www.youtube.com/watch?v=8rL3QpGLxMo.

interview, Defendant Maddrey stated, "The minute Ebro asked about Edelman, everyone spoke your name. That wasn't a good move."

96.     On or about the evening of June 5, 2020, Defendants, including Defendant Maddrey, held a meeting of Brooklyn North Precinct Commanders and other NYPD members, believed to include Defendant Daughtry, during which time Defendants warned these commanders not to permit Ms. Rachlin to enter NYPD precincts or continue her work in their jurisdiction.

97.     In June 2020, during a separate meeting, Defendant Chell stated, in sum and substance, that "[Ms. Rachlin] should know we can humiliate her at any time."

98.     Also in June 2020, shortly after this meeting, Defendant Chell ordered a subordinate member of the NYPD to share this threat with Ms. Rachlin, which this subordinate did.

99.     Though Ms. Rachlin was unaware as to what information Defendant Chell purported to possess, she understood that Defendant Chell intended to harm her reputation.

### *2021 Conflicts*

100.    Defendants' conduct following the June 2020 events hindered Ms. Rachlin's ability to reach participants and conduct community events in Brooklyn North, specifically Brownsville, Brooklyn, and significantly impacted her professional work.

101.    Ms. Rachlin was denied from and/or chilled in seeking grants and community partnerships and was forced to rearrange her practice to avoid areas where she was at stated risk of reprisal by Defendants. Ms. Rachlin was denied access to police precincts and other public accommodations.

102.    However, Ms. Rachlin was determined to continue to work with the Brownsville Safety Alliance (BSA) and to conduct healing circles, voter registration events, and other services

for We Build the Block participants.

103.     Ms. Rachlin sought to accomplish this by introducing and/or fostering NYC Together programs in other neighborhoods in Kings County, including Sheepshead Bay, with the assistant of a small independent grant.

104.     Ms. Rachlin conducted this work with the assistance and participation of NYPD Captain Derby St. Fort, whose 61st Precinct Command included Sheepshead Bay and the Nostrand Houses.

105.     As detailed in an April 28, 2021, *New Yorker* article, Captain St. Fort had been second-in-command to Defendant Edelman during his tenure in the 73rd Precinct.[18] There was fallout between Captain St. Fort and Edelman around Captain St. Fort's support for violence interruption models that did not rely exclusively on police.[19]

106.     Several NYPD sources, including Defendant Edelman, provided interviews prior to the long-form, approximately 7,800-word *New Yorker* article's publication and were quoted on the record regarding the tensions and conflicts within the 73rd Precinct.[20]

107.     Having been asked for comment and/or otherwise informed of the article's pending publication under these circumstances, by early April, Defendants, at minimum, were aware that the *New Yorker* was investigating the events giving rise to Defendant Edelman's ouster and believed Ms. Rachlin to be responsible for public scrutiny into the issues they intended to quash in 2020.

108.     The article and preceding investigation reignited Defendant's anger regarding Ms.

---

[18] Saki Knafo, *Bridging the Divide Between the Police and the Policed*, THE NEW YORKER, April 28, 2021, *available at* https://www.newyorker.com/news/our-local-correspondents/bridging-the-divide-between-the-police-and-the-policed ("Unfortunately, violence interrupters were not viewed as legitimate by many of my peers," St. Fort pptold [Saki Knafo], in an e-mail. "I decided to lean on the community, even though it felt like a risk to my professional career.")
[19] *Id.*
[20] *Id.*

Rachlin's 2020 conduct, namely her perceived responsibility for sparking Defendant Edelman's transfer and the resulting appointment of Inspector Terrell Anderson, a proponent of "community-led" policing, to the post in the 73rd Precinct.[21]

109.    Accordingly, Defendants escalated their retaliation against Ms. Rachlin.

*April 8, 2021*

110.    Shortly before the article's publication, on April 8, 2021, Reverend Kevin McCall ("Rev. McCall"), a pastor and social justice advocate, requested to meet with Ms. Rachlin.

111.    Ms. Rachlin accepted the meeting, anticipating that Rev. McCall wanted to discuss community initiatives. The two met in a diner in Kings County.

112.    Instead of discussing a collaboration, Rev. McCall initiated the conversation by informing Ms. Rachlin that, in sum and substance, if she did not admit to what she had "done," he was prepared to destroy her reputation using his social media platforms.

113.    Ms. Rachlin did not understand the subtext of this threat and said so.

114.    She learned that Defendant Brian Adams, then the NYPD's Community Coordinator, and Defendant John Chell, then the NYPD's Deputy Chief, had falsely informed Rev. McCall and other community advocates that Ms. Rachlin had fabricated a rape accusation against a Black man.

115.    Defendants further falsely stated to Rev. McCall that the NYPD had declined to pursue Ms. Rachlin's claim due to proving she had in fact been rejected by the man.

116.    Defendants further falsely stated to Rev. McCall that Ms. Rachlin was involved in criminal activity, including so-called gang activity.

117.    Defendants further falsely claimed that Defendant Chell had personally conducted

---

[21] *Id.*

the controlled call between Ms. Rachlin and her assailant, and that the call exonerated its target. In fact, the controlled call had been conducted in person by Ms. Rachlin in the presence of two NYPD SVD detectives with no involvement by Defendant Chell.

118.    Based on this information, Rev. McCall informed Ms. Rachlin that he was, in sum and substance, "on to her," and would ensure that no community organizations would work with her.

119.    In the face of these defamatory allegations and the damage done to her reputation, Ms. Rachlin felt that she had no choice but to divulge to Rev. McCall the deeply personal and traumatizing details of her assault in a humiliating scene in a public diner.

120.    Over the next two years, Ms. Rachlin would be forced to recount the brutal details of her rape repeatedly due to Defendants' conduct.

121.    Upon information and belief, Rev. McCall did not continue to spread this information after his meeting with Ms. Rachlin.

122.    However, Defendants, believed to include Defendants Brian Adams, Chell, and Daughtry, had made these defamatory claims against Ms. Rachlin to an unknown number of other individuals.

123.    For example, also on April 8, 2021, upon learning of Ms. Rachlin's meeting with Rev. McCall, Mr. Williams notified Ms. Rachlin that he, too, had been informed by NYPD sources that Ms. Rachlin had falsely reported her rape and that the NYPD had declined to pursue the rape claim for this reason.

124.    Defendants' campaign also extended far beyond Ms. Rachlin's trusted inner circle and significantly impacted Ms. Rachlin's personal and professional life.

125.    Indeed, Defendants, or individuals to whom they had disseminated these

defamatory claims against Ms. Rachlin, conveyed these claims to individuals in at least two Crisis Management Sites, including employee(s) with the Center for Justice Innovation (CJI), and Brownsville In, Violence Out (BIVO).

126.     Also on April 8, 2021, following the news that NYPD members had spread defamatory statements to multiple individuals and community partners, Ms. Rachlin called Defendant Maddrey given his knowledge of the details and veracity of her 2017 rape.

127.     During this call, Ms. Rachlin informed Defendant Maddrey that, several years after her rape, NYPD members had spread false and damaging information about this assault in retaliation for her work and advocacy, including in opposing the tactics of Defendant Edelman, and that she was aware that Defendants, including Chell and Daughtry, were involved in the dissemination of these statements.

128.     During this call, Ms. Rachlin pleaded with Defendant Maddrey to put an end to this defamation campaign against her.

129.     Ms. Rachlin implored, "You saw me when I sat in the hospital, and I was crying, and I told you I didn't want to call the police. And I didn't want to do a report. And you said, Dana, look at your neck. You have handprints on your neck, you have to do a report."

130.     Defendant Maddrey confirmed these events. He further assured Ms. Rachlin that she had done the right thing by reporting her rape, recalled witnessing the aftermath of her assault in the hospital, and stated, "You absolutely were not making false allegations."

131.     Defendant Maddrey further stated, "I will call John Chell and see what he has to say…I'll talk to the people on this side. Like I said if they had anything, any part of this, it will be put to an end."

132.     Then, in a text sent on April 12, 2021, Defendant Maddrey wrote, "I spoke to

everyone on my side, there will be no further issues."

133.     There were further issues.

### *September 2021*

134.     On September 6, 2021, Michael K. Williams died at age 54 in Brooklyn, New York. Ms. Rachlin joined Mr. Williams' devastated family to mourn his passing.

135.     The NYPD shared details of Mr. Williams' death with the press and participated in news stories related to his passing, including through Defendant Chell in a sensationalized and misrepresented story published in *The Daily Beast* that presented an exaggerated role played by Defendant Chell in matters concerning Mr. Williams.[22]

136.     Thereafter, despite her trepidation, grief, and anxiety regarding further retaliation, Ms. Rachlin became increasingly vocal about the NYPD's mistreatment of community members and the leadership's apparent campaign to discredit those, like herself and the late Mr. Williams, who openly sought to interrupt the Department's preferred model of policing—which appeared to favor individuals such as Defendant Edelman.

137.     Despite the damage done to her reputation, and with significantly reduced fundraising abilities due to her reputational damage compounded by personal tragedy, Ms. Rachlin continued NYC Together/We Build the Block work to the best of her ability.

### *2022 Conflict and Letters*

138.     On February 4, 2022, Captain St. Fort was the subject of a widely-circulated *New York Times* article touting his involvement in We Build the Block and its effect on its young participants as an alternative to arrest-and-incarcerate policing.

139.     Defendants were aware of Ms. Rachlin's direct involvement in the publication of

---

[22] Michael Daly, *How the NYPD Cracked the Michael K Williams Overdose Case*, Feb 2, 2022, *available at* https://www.thedailybeast.com/how-the-nypd-cracked-the-michael-k-williams-overdose-case?ref=home.

this story.

140.     Shortly thereafter, on or about February 22, 2022, a single-spaced, two-page letter signed "on behalf of the hardworking members of the NYPD 61st Precinct" and addressed to Defendant Sewell was sent to elected officials and religious leaders as well as community members. *See* **Exhibit 1**.

141.     The letter was manually placed inside of the property lockers of multiple NYPD members.

142.     These lockers are in an area restricted to NYPD personnel.

143.     The letter was mailed to various addresses of community members within the 61st Precinct.

144.     The letter was mailed to multiple New York City elected officials.

145.     In addition to various other allegations made against Ms. Rachlin, Captain St. Fort, and certain community members and participants engaged in We Build the Block, the letter accused Ms. Rachlin of falsely reporting her rape. *Id*.

146.     The letter falsely alleged that Ms. Rachlin had engaged in consensual sex with her assailant before pursuing a false rape allegation against him. *Id*.

147.     The letter further falsely claimed that the NYPD and Brooklyn DA's Office had both closed the case and proven that Ms. Rachlin had falsified her allegation. Both claims are demonstrably and materially false.

148.     The letter claimed that all information contained in the letter was verified by NYPD records. *Id*.

149.     Defendants' harmful conduct targeting Ms. Rachlin continued.

150.     On or about April 15, 2022, a second letter was received via mail by multiple individuals, including members of the NYPD such as Brooklyn North Executive Officer Defendant

Scott Henderson. *See* **Exhibit 2**.

151.   The memo was written in the format typically used in an NYPD operations directive or "49 Memo."

152.   The memo was titled, "Beware of the Wolf in Sheep's Clothing: The Racist Branding Police Officers as Racist." *Id*.

153.   In the memo, Defendant(s) reiterated the demonstrably false claims that Ms. Rachlin accused an innocent Black man of rape and that the NYPD had closed the case after its investigation clearly exonerated this person. *Id*.

154.   However, Defendant(s) included distorted details taken from internal NYPD paperwork, such as the identity of Detective Weber, which lent undue credibility to these demonstrably false accusations.

155.   Defendant(s) falsely claimed that Ms. Rachlin had directly caused a "surplus of avoidable crime" by accessing the NYPD's Gang Database and sharing the classified information contained therein with individuals for criminal purposes. *Id*.

156.   Defendant(s) included Ms. Rachlin's home address and listed her as "affiliated" with NYC Together, We Build the Block, and Crew Count. *Id*.

157.   Defendant(s) falsely accused Ms. Rachlin of engaging in *quid pro quo* exchanges of sex with NYPD members for information about program participants. The memo included a section titled "Charm" to discuss these false allegations and to accuse Ms. Rachlin of using "feminine charm" to elicit information for criminal purposes.

158.   Defendant(s) criticized Ms. Rachlin for making a social media post mourning the shooting death of a program participant, a young man whose death the memo describes as being "neutralized."

159.     This social media post was specifically shared and criticized in texts sent by Defendant Brian Adams to Defendant Chauncey Parker, after it was shared by Defendant Craig Edelman to Defendant Brian Adams via text messages on NYPD phones.[23]

160.     In previous interdepartmental texts, received in a 2023 FOIL disclosure, Defendant Brian Adams shared additional screenshots of posts by Ms. Rachlin criticizing violent policing. In separate messages, Defendant Brian Adams shared these posts and assured Defendant Edelman and Defendant Chauncey Parker that he would "be speaking to all the bosses about her." Defendant Brian Adams further told Defendant Edelman to "keep his head up."

161.     Defendant Brian Adams further engaged in multiple text exchanges with Rev. Kevin McCall regarding Ms. Rachlin, which included screenshots of Ms. Rachlin's social media.

162.     Interdepartmental texts further reveal NYPD members discussing Ms. Rachlin's employment by John Jay College, the name of her supervisor, and the program's involvement in the Brownsville Safety Alliance (BSA) in text messages.

163.     Defendants have actively opposed Ms. Rachlin's involvement in the BSA as part of their retaliation campaign, significantly hindering her work and threatening her employment.

164.     Upon information and belief, in addition to slandering Ms. Rachlin through verbal statements, calls, and communications with multiple individuals, Defendants, including, but not limited to, Defendants Brian Adams, Craig Edelman, John Chell, and Kaz Daughtry, and Defendant Does # 1 – 5, authored and/or supplied information for and/or disseminated the letter(s) and/or memo(s) containing known false and defamatory statements about Ms. Rachlin.

---

[23] As discussed above, the NYPD withheld all IAB files and related records in response to Ms. Rachlin's FOIL requests. For this reason, though Plaintiff has received text messages, emails, and other information via FOIL request, including the messages referenced here, these disclosures are not comprehensive, and Plaintiff does not yet know the extent of these communications between Defendants and/or other individuals.

165. No Defendants intervened or prevented the violations perpetrated against Ms. Rachlin despite possessing the requisite knowledge and opportunities to do so.

166. Defendant Maddrey, along with other NYPD supervisor Defendants, including Defendant Chauncey Parker, knew of the abusive conduct of his subordinates and was aware of the defamatory nature of the claims these subordinates made against Ms. Rachlin, but failed to intervene, properly report, discipline, or otherwise mitigate the harm done to Ms. Rachlin despite possessing the knowledge and opportunity to do so.

***Damages***

167. Defendants have caused Ms. Rachlin to suffer significant damage and loss and have deprived Ms. Rachlin of her liberty and property interests.

168. Defendants caused, and continue to cause, serious damage to Ms. Rachlin's reputation, which is integrally tied to Ms. Rachlin's professional work as a community program and service provider, a John Jay employee, and independent nonprofit executive.

169. Defendants discouraged Ms. Rachlin from taking public-facing roles to further her organization's work and forced Ms. Rachlin to change the location of her programming to her organization's detriment and pecuniary loss.

170. Defendants caused Ms. Rachlin to be precluded from consideration for grants and/or contracts.

171. Defendants chilled Ms. Rachlin's constitutionally protected conduct by discouraging her from seeking professional opportunities for fear of being forced to share the details her sexual assault and defend the veracity of her valid claims.

172. Defendants induced community partners and government actors to refuse to work with Ms. Rachlin by damaging her reputation.

173.   Defendants shared Ms. Rachlin's home address and disseminated the same in the memo, causing Ms. Rachlin to expend significant costs on home security systems and depriving her of the quiet enjoyment of her home.

174.   Defendants forced Ms. Rachlin to expend costs on rebranding, crisis management, public relations, and image rehabilitation, the costs of which continue to accrue.

175.   Defendants further caused Ms. Rachlin emotional and psychological damages, including anxiety, difficulty sleeping, humiliation, fear of physical harm, emotional anguish, depression, and post-traumatic stress.

176.   The full extent of Ms. Rachlin's physical and psychological injuries is not yet known, and their effects are ongoing.

## FIRST CLAIM FOR RELIEF

### § 1983 Defamation (Stigma Plus)

*Against Defendants Brian Adams, Chell, Daughtry, Edelman, and Does # 1 – 5 Pursuant to 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution*

177.   Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

178.   Defendants violated Ms. Rachlin's rights under the "defamation plus" doctrine.

179.   Defendants' statements, and the circulation of the same, were sufficiently derogatory to injure Plaintiff's reputation, were capable of being proven false, and were all identified as false by Plaintiff.

180.   In addition to knowingly creating and/or knowingly disseminating defamatory statements, letter(s), and memo(s), Defendants, each governmental employees and/or agents and/or policymakers, imposed a material state-imposed burden or state-imposed alteration of the Plaintiff's status or rights.

181. Plaintiff suffered both a loss of reputation—including loss of standing directly resulting from spurious claims of fabricated sexual assault, criminal activity, and racism—coupled with the deprivation of her liberty and/or property interests.

182. Known and demonstrably false and defamatory statements were made to third parties, namely Rev. Kevin McCall, Michael K. Williams, and additional third parties, including those who received written correspondence and those whose identities have not yet been confirmed.

183. These statements were undertaken by Defendants in an attempt to retaliate against and to humiliate and/or silence and/or intimidate Ms. Rachlin, and to chill her participation in public discourse, including through her professional work.

184. These defamatory statements include, but are not limited to, false statements made by Defendants Brian Adams and John Chell, and Defendant Does # 1 – 5, to Rev. Kevin McCall, and to additional individuals with influence over Ms. Rachlin's reputation and professional work, on or about April 8, 2021. These statements include the false claims that Ms. Rachlin:

i    Fabricated the fact of her rape;

ii    Falsely attempted to frame a Black man for this crime, and had done so due to his rejection of her and due to her apparent racial animus;

iii    Wished to utilize the NYPD to commit this crime, and insisted that the investigation take place despite the NYPD's refusal;

iv    Was recorded during a controlled call conducted by Defendant Chell, and, as such, according to Defendants, Defendant Chell was therefore privy to the supposed falsity of her claims;

v    Was informed that the NYPD had terminated the case against her due to proof she had not been raped, and, indeed, that she had actually been unsuccessful in attempting to have sexual intercourse with the man she accused; and

vi   Was engaged in criminal gang activity.

185.    Details of Ms. Rachlin's sexual assault, including the fact that she reported the assault, that she participated in a controlled call, and the race of the person she identified, were disseminated along with false and derogatory statements for the purposes of defaming Ms. Rachlin by members of the NYPD, believed to include Defendant Brian Adams, Defendant John Chell, Defendant Kaz Daughtry, and Defendant Does # 1 – 5.

186.    Members of the NYPD, including Defendant Does # 1 – 5, further authored and disseminated defamatory letter(s) and memo(s) against Ms. Rachlin containing further defamatory allegations. *See* **Exhibit 1** (February 2022 Letter) and **Exhibit 2** (April 2022 49-Memo).

187.    Defendants shared Ms. Rachlin's private home address as part of this defamatory correspondence. *See* **Exhibit 2**.

188.    Defendants falsely stated that: Ms. Rachlin had fabricated the fact of her rape, that she had actively attempted to seduce the man she accused before this false accusation, that she had falsely accused a Black man due to rejection and racial animus, that she had engaged in criminal conduct to access confidential police information, including information stored in the NYPD's Gang Database, for criminal purposes, and that she had committed crimes related to evidence tampering. *See* **Exhibits 1 and 2**.

189.    These statements were provided to third parties, including elected official(s), known to include at least one elected official in Kings County, to community members, to members of the

NYPD, and to other individuals with influence over Ms. Rachlin's professional work and reputation.

190.    Defendants' statements were provably untrue and were disseminated throughout Ms. Rachlin's personal and professional networks.

191.    Defendants' defamatory conduct described herein deprived Ms. Rachlin of property and liberty interests. These interests include, but are not limited to:

      a.    Professional opportunities, contracts, and collaborative agreements related to Plaintiff's work as a community service provider and nonprofit executive;

      b.    Ms. Rachlin's reputation, which is directly tied to her professional work;

      c.    Plaintiff's relationships with community partners and/or funders in connection to Plaintiff's professional work;

      d.    The right to enter the area encompassed by the 73rd Precinct, including the entire neighborhood of Brownsville, Brooklyn, without fear of reprisal;

      e.    The right to enter any NYPD precincts and other police-controlled public accommodations; and

      f.    The interest in Plaintiff's enjoyment of her property and her home, the address for which was circulated by Defendants in connection with these claims.

## SECOND CLAIM FOR RELIEF

### Municipal Liability

***Against Defendant City Pursuant <u>to 42 U.S.C. § 1983</u> and
<u>Monell v. Department of Social Services</u> (436 U.S. 658 [1978]) for Defendants'
Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United
States Constitution***

192.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

193. Defendant City, through its policymakers including Defendant Mayor Adams, Defendant Shae, Defendant Sewell, and Defendant Caban, were responsible for implementing and enforcing policies and procedures on behalf of the Defendant City.

194. The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, but not limited to:

   a. The mishandling of sexual assault claims by the NYPD;

   b. The leaking and/or misappropriation of gender-based violence victims' personal information;

   c. Public attacks against individuals who criticize, or are perceived to criticize, the Department or its members;

   d. Retaliation against individuals who criticize NYPD policies, conduct, or powerful and/or high-ranking members of the Department; and

   e. Interfering and/or threatening the work and livelihood of individuals employed by Crisis Management Sites and/or engaged in community advocacy if these individuals, such as Plaintiff, object to NYPD conduct.

195. All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to:

   a. Formal policies, rules, and procedures of Defendant City;

   b. Actions and decisions by Defendant City's policymaking agents;

   c. Customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City and by Defendants

Mayor Adams, Shea, Sewell, Caban, Maddrey, Chell, and other policymaking officials;

d.  Defendant City's deliberate indifference to Plaintiffs' rights secured by the First and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD Members, despite full knowledge of the members' wrongful acts, as described herein.

## THIRD CLAIM FOR RELIEF

### First Amendment Retaliation

***Against Defendants Brian Adams, Chell, Edelman, Daughtry, Maddrey, Parker, and Does # 1-5 Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

196.  Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

197.  Defendants imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in making Plaintiff the victim of hostile, defamatory, and violent public smear and harassment campaign, in interfering with Plaintiff's potential investors and/or partners and/or business interests, in subjecting Plaintiff to Defendants' harmful policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

198.  Defendants further engaged in retaliation against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, including, *inter alia*, her protected conduct in:

a.  Criticizing Defendants' positions regarding the lack of discipline for NYPD members who commit acts of violence and the continued subjection of New Yorkers to the same;

b. Speaking to member(s) of the media about the violent conduct of Defendant Craig Edelman, and/or encouraging others to do so, including as related to coverage in *New Yorker* and/or *The New York Times*;

c. Publicly opposing the promotion of Defendant Edelman and Defendant Chell in the wake of their respective public acts of violence;

d. Associating with individuals who lawfully recorded and/or lawfully questioned Defendants; and

e. Associating with individuals for the purpose of community engagement, the Brownsville Safety Alliance, Crew Count, Heal the Violence, and/or other civic and community engagement.

199. Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

200. Defendants engaged in the acts and omissions complained of herein to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

201. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

202. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of his First Amendment rights.

203. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

204. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

205. Upon information and belief, Defendants did not subject other others similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

206. Plaintiff suffered actual chill, including in that Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident, including her right to be lawfully present in public spaces and/or to associate with neighbors and members of his community; and/or suffered adverse effects on her protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

207. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in detaining and assaulting Plaintiff subjected Plaintiff to the violations of her First Amendment rights described elsewhere herein.

208. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### Failure to Train and/or Supervise

*Against Defendants City, Mayor Adams, Shea, Sewell, Caban, Maddrey, and Chell Pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)*

209. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

210. Defendant City and its policymaker Defendants Mayor Adams, Sewell, Caban, Maddrey, and Chell failed to train and supervise the Defendant NYPD members.

211. All individual Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Ms. Rachlin's injuries.

212. Defendants knew or should have known that Defendant NYPD Members were likely to violate the constitutional rights of individuals in their custody.

213. Defendants know that NYPD Members are certain to regularly encounter circumstances described herein, including investigating an incident involving sexual assault, interacting with victims of gender-based violence, handling sensitive and private victim information, and being subjected to criticism related to their conduct while on duty, through the course of their employment.

214. Defendants knew that there is a history of wrongful conduct in these scenarios by NYPD Members.

215. Defendants further knew that training and/or supervision could ameliorate the potential harms of constitutional violations in these scenarios, including civil rights violations and physical and emotional injuries.

216. Nevertheless, Defendants failed to train its agents and/or employees regarding their conduct during the scenarios described herein and further failed to supervise its agents and/or employees when engaged in high-risk contact.

217. By failing to train and supervise Defendant NYPD Members, these Defendants exhibited a conscious disregard and/or deliberate indifference for the risks posed by NYPD members' conduct absent adequate training and supervision.

## FIFTH CLAIM FOR RELIEF

### Negligent Screening, Hiring, and Retention

***Against Defendants City, Mayor Adams, Sewell, Caban, Maddrey, and Chell Pursuant <u>to 42 U.S.C. § 1983</u> and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978)***

218. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

219. All Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Plaintiff's injuries.

220. Defendant City, by its policymakers, knew that the individual Defendants had a propensity for the conduct giving rise to Plaintiff's injuries.

221. This conduct includes propensity for willingness to lie, including under oath and/or to serve an agenda; retaliatory actions against individuals who complain of mistreatment and/or abuse by NYPD members; the abuse and harassment of women; and propensity for violence.

222. This propensity was evinced through instances of Defendants' misconduct and abuse, including instances known to Defendants, and further including, but not limited to, publicly available evidence such as:

   a. A civil jury's finding in *Bovell v City of New York, et al*., establishing that Defendant Chell lied under oath regarding the circumstances under which he

killed Ortanzso Bovell, as Mr. Bovell was running away from Defendant Chell and posed no threat when Defendant Chell shot him in the back;[24]

b.  The sexually abusive conduct of Defendant Brian Adams, including, but not limited to, incident(s) in which he exposed his erection and behaved in a sexually coercive manner to female coworkers in the workplace, and retaliated against at least one woman who refused his advances, as documented in complaints filed by two women with the Equal Employment Opportunity Commission;

c.  The Civilian Complaint Review Board's determination that Defendant Maddrey abused his authority in a matter where he intervened to void the arrest of a retired officer and colleague who chased three children in Brooklyn for seven minutes while brandishing a gun;[25]

d.  A civil settlement in *Zayer v City of New York, et al.*, 20-CV-06070 (S.D.N.Y.) (2021) against Defendant Edelman, in which video evidence showed that he directly supervised the assault and resulting traumatic brain injury of a protestor without intervening, providing aid, or issuing discipline to the assailant officer;

e.  Multiple misconduct complaints against Defendant Edelman even prior to the June 2020 assault, including the wrongful search and harassment of a person witnessed and reported by two elected officials;[26]

---

[24] *See* Eileen Grench, *NYPD 'Accidental' Killer Cop's Rise to Brooklyn Chief Questioned*, THE CITY, April 15, 2021, *available at* https://www.thecity.nyc/2021/04/15/nypd-accidental-killers-rise-to-brooklyn-chief-questioned/ (last visited April 2, 2024).

[25] *See* Yoav Gonan, *WATCH: Videos Show NYPD Chiefs Intervened Before Voiding of Ex-Cop's Gun Arrest*, THE CITY, March 9, 2023, available *at* https://www.thecity.nyc/2023/03/09/nypd-police-jeffrey-maddrey-video/ (last visited April 5, 2024).

[26] *See* Eileen Grench and Yoav Gonan, *NYPD Cop in Protester-Shoving Left Trail of Rough Policing Complaints in Brownsville*, THE CITY, June 19, 2020, *available at* https://www.thecity.nyc/2020/06/19/nypd-cops-in-protester-shoving-ccrb-complaints-brooklyn/ (last visited April 1, 2024).

f.   Widespread allegations of sexual misconduct and/or the mishandling of private and/or protected information by Defendants; and

g.   Multiple prior instances of NYPD members unlawfully leaking and utilizing sealed and/or otherwise confidential information to harm and/or discredit the target of the leak, including the routine, impermissible release of records sealed pursuant to New York Criminal Procedure Law § 160.50 by NYPD members, as detailed in the class action lawsuit *R.C., et al. v City of New York et al.* (153739/2018) (New York County 2018).

223.   Defendants failed to adequately screen, hire, or retain employees in consideration of such employees' recognizable propensity for harm.

224.   Indeed, and as described herein, individual Defendants have repeatedly been promoted, empowered, and validated by Defendant City and its supervisor/policymaker Defendants with the NYPD.

225.   Plaintiff was injured as a result of Defendants' conduct.

### SIXTH CLAIM FOR RELIEF

**Breach of Duty to Protect**

***Against All Defendants Pursuant to 42 U.S.C. § 1983***

226.   Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

227.   The Defendant City, by its agents, had a special duty to Plaintiff and possessed sufficient knowledge that inaction would lead to the harms suffered by Plaintiff.

228.   Defendants witnessed and/or knew of the harmful conduct of fellow Defendants and merely observed and/or unreasonably ignored such conduct against Plaintiff.

229. Defendant City and its employees and/or agents breached the existing duty to protect Plaintiff, and such inaction enabled and/or facilitated and/or exacerbated the harms caused by Defendants' conduct and suffered by Plaintiff.

## SEVENTH CLAIM FOR RELIEF
### Conspiracy
*Against Defendants Pursuant to 42 U.S.C. § 1985(3)*

230. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

231. Through the conduct described and complained of herein, Defendants conspired to deprive Plaintiff of the equal protection of the laws, or of equal privileges and immunities under the laws.

232. Defendants acted in furtherance of this conspiracy against Plaintiff, and as a result of this conduct, Plaintiff was injured in his person and property and deprived of her constitutional and civil rights.

233. Defendants engaged in (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and further engaged in (3) an act in furtherance of the conspiracy, (4) whereby Plaintiff was injured in her person and/or property and/or deprived of any right or privilege of a citizen of the United States.

## EIGHTH CLAIM FOR RELIEF
### Failure to Prevent Civil Rights Violations
*Against All Defendants Pursuant to 42 U.S.C. § 1986*

234. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

235. The NYPD Defendants had knowledge that the wrongs conspired to be done against Plaintiff in violation of 42 U.S.C. § 1985 were to be committed and had the power to prevent and/or aid in preventing the commission of this conduct.

236. Defendants neglected and/or refused to prevent the commission of this conduct and Plaintiff sustained harm and/or the exacerbation of harm and the deprivation of her rights as a result of this failure.

237. Defendants are liable for all damages caused by the conspiratorial conduct they failed to prevent despite possessing the power to do so.

## NINTH CLAIM FOR RELIEF

### Protection from Gender-Based Violence

***Against All Defendants Pursuant to NYC Admin. Code § 10-1102, et seq.***

238. Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

239. In 2018, the New York City Council enacted NYC Admin Code, Title 10, Ch. 11, § 10-1102, *et seq.* (Actions by Victims of Gender-Based Violence) in recognition of the fact that "gender-motivated violence inflicts serious physical, psychological, emotional and economic harm on its victims."

240. The section provides a private right of action to victims of gender-based violence in recognition of the public's interest in addressing and redressing these acts of harm.

241. This provision defines "crime of violence" as "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another." § 10-1102.

242. Defendants' conduct constitutes a criminal offense under, *inter alia*, the New York State Penal Law (PL) § 240.30(1)(A) (Harassment in the Second Degree, a Class A Misdemeanor) and the Title 18 U.S. Code § 876 (Mailing Threatening Communications).

243. Defendants' conduct, including by intentionally including Ms. Rachlin's personal address, including her apartment number, in widely disseminated defamatory documents, carried "the risk of physical injury" and constitutes a crime of violence under this provision. § 10-1103.

244. Defendants' conduct was committed because of Plaintiff's gender or on the basis of gender, and due, at least in part, to an animus based on Plaintiff's gender. § 10-1103.

245. Under NYC Admin. Code § 10-1102, *et seq*., a victim of gender-based violence may pursue a private right of action, in addition to any other cause of action to which they are entitled to damages, against the perpetrator(s) of any such crime of violence against them.

246. Plaintiff is therefore entitled to damages, including actual and punitive damages, as well as injunctive and declaratory relief, against Defendants.

247. As a result of the conduct described herein, Plaintiff was deprived of her liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, was forced to expend costs, and was otherwise damaged and injured.

## TENTH CLAIM FOR RELIEF

### Unlawful Discrimination and/or Retaliation

### *Against All Defendants Pursuant to NYC Admin. Code § 8-102, et seq., and § 8-502*

248. Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

249. As described herein, Ms. Rachlin was a victim of a sex offense classified under P.L. § 130 and is protected under this provision from discrimination and retaliation based on her status. *See* § 8-102.

250. As described herein, Defendants refused Ms. Rachlin free and equal access to a public accommodation in a manner constituting unlawful discrimination. *See* §§ 8-107(4), 8-107(28)(b).

251. As described herein, Defendants retaliated against Plaintiff for engaging in protected conduct under this provision. *See* § 8-107(7).

252. Plaintiff is entitled to pursue an action for damages for these claims pursuant to § 8-502.

253. Plaintiff may maintain this claim against members of the police department, as the protections invoked by Plaintiff arise from Chapter 1 of the Title, including § 8-107.

254. Plaintiff has not commenced an action with the New York City Human Rights Commission or any State or Federal Agency such that the instant Complaint would be preempted or tolled by any competing action.

255. Plaintiff shall serve a copy of the instant Complaint upon a designated agent of the New York City Commission on Human Rights within ten (10) days of filing.

256. Due to Defendants' conduct in violating these provisions of the New York City Civil Rights Law, Plaintiff is entitled including punitive damages, injunctive relief, and such other remedies as may be appropriate, in addition to all other damages to which she is entitled.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff respectfully seeks relief from this Court and demands judgment against the individual Defendants and the City of New York in the following forms:

i.  Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.  Actual damages in an amount to be determined at trial against Defendant City;

ii.  Statutory attorney's fees, disbursements, punitive damages, actual damages, and costs of the action pursuant to, *inter alia*, 42 U.S.C. §1988, N.Y. Civ. § 28, NYC Admin. Code §§ 10-1104 and 8-502; and

iii.  Such other relief as the Court deems just and proper.

**Dated:**     Brooklyn, New York
               April 7, 2024

**KAISHIAN & MORTAZAVI LLC**

By: _____
Maryanne K. Kaishian
S. Masoud Mortazavi
55 Washington Street, Ste. 508
Brooklyn, New York 11201
Attorneys for Plaintiff, Dana Rachlin
    T: (347) 662-2421
    E: mk@kaishianlaw.com
    E: smm@kaishianlaw.com

# EXHIBIT 1

Dear Commissioner Sewell,

We respectfully request your immediate attention to a very alarming and dangerous act of serious misconduct. It has come to the attention of residents of the 61 Precinct that there was a potential serious violation and act of misconduct by Capt. Derby St. Fort, The Commanding Officer of the 61st Precinct. This past event was shared with us by Police Officers from the 61, Officers who are stunned, concerned, and have lost all desire to work for the Captain. Here is the story.

On December 31, 2021 Police Officers were watching a social media platform and saw a young man they identified a ▓▓▓▓ ▓▓▓ a gang member, inside of bar called Club Midst on Coney Island Ave. At this time ▓▓ ▓▓ was streaming live holding a gun. When these Police Officers showed Captain St. Fort he instructed a Lieutenant and some officers to go to the club, BUT not to touch ▓▓▓▓ He told them to check the bar and spook the kids. When they arrived, they checked the club, and observed Mr. ▓▓ in the club but did not touch him as ordered. They walked through the club and left. Later, the social media post disappeared. It is alleged that Capt. St Fort is friends with ▓▓▓▓▓ and called to warn them. Why would the Captain risk the lives of his Officers? Why would he leave a gun in our community? Why would he protect a gang member? Gun violence in our city is out of control! Many NYPD cops have been shot and killed this year. If this story is true, Capt. St. Fort should be disciplined and removed from his post.

It has been pointed out to us that Captain St Fort is part of an organization called We Build The Block. This organization helps kids out of gang violence. We believe there was a story on this recently in the Times and profiled on WPIX 11. He has 15 kids from Public Housing he talks to and gives them money in an effort to keep them away from violence. ▓▓▓▓ is one of his 15 kids. Mr. ▓▓ is part of a gang whose members caused a shooting in Kings Plaza. It is the opinion of many Police Officers in 61 Precinct that Capt. St. Fort didn't want to tarnish his program and could protect Mr. ▓▓ from being arrested with a gun. However, he couldn't hide the shooting in Kings Plaza by another one of his group's kids.

We decided to look closer at the "We Build the Block Program" and discovered it's run by a woman named Dana Rachlin. It appears on her social media she is from Staten Island and has inserted herself as an advocate of social justice issues within the African American community. However, from our research she appears to have disdain for the NYPD that is clearly demonstrated on her social media. She recently openly mocked a $600,000 basketball court built for Harlem children by the NYPD. Prior to Capt. St Fort's appointment at the 61st Precinct, we had never heard of Ms. Rachlin, nor had she expressed any interest in our community. Why is a person who hates NYPD policies involved in a partnership with an NYPD Captain? Why is she welcomed into our facilities? It's hard enough for our officers to work in a tough environment and yet they must interact in the sanctity of their Precinct with a person who despises them!

It has now come to our attention that Ms. Rachlin's hatred towards the NYPD stems from an incident that occurred in Fall 2018. After a fundraiser hosted by Ms. Rachlin on behalf of NYC Together, she admitted to an opioid and alcohol laced evening, and she accused a guest of a heinous crime. She said this alleged crime was committed by an African American man. Due to the work of your Detectives and the District Attorney's Office this crime was proven to be fabricated through inconsistent statements and video proof. Ms. Rachlin made a phone call to once again try to trap this innocent male but that failed. Ms. Rachlin was instructed to withdraw her complaint. To this day she denies that these events ever happened. We are told this is all documented in the NYPD reports. Ms. Rachlin was willing to send another innocent African American to jail for her own gain. What a disgrace! Lastly, her romantic involvement with Capt. St Fort is public knowledge. This relationship is clearly clouding his judgment, and it has become the motive for their anti-police policies.

It's remarkable that we have an African American Commanding Officer who is romantically involved with a fraudulent privileged white female Community Activist who hates the NYPD. An activist who is allowed access to our facilities, our officers, and children we are trying to help. Would anyone want their children around someone who takes opioids? A person who hates us and portrays our hard-working cops as oppressors of the

**EXHIBIT 1, Page 1 of 2**

African American community? YET, she had zero issues with trying to implicate an innocent African American male to raise her community "victim" status and take advantage of a Me-Too Movement. A movement that many women have suffered great pain for. How can we allow Capt. St Fort to continue to work with her? This is wrong! We need genuine people to help our city, not people who want to serve themselves on the backs of downtrodden communities.

Again, if this is true, the Captain is more concerned about his image and growth in the department, above the safety of his officers and the community. He should be removed immediately.

Capt. St Fort is focusing his program towards a very minuscule part of African American Community in the 61st Precinct. The community is primarily Caucasian, Asian, Russian, Irish, and Jewish. Is he putting his energy into them as well? It appears he is portraying that the very small African American population of young kids is the crime issue in our community. This alone has a racial component. Most of the crime in our community is being committed by Caucasian males who suffer from opioid abuse. Does he have a program built for them? Or is it they are privileged, and his efforts will not be rewarding for his career. Making these young males a platform for his progression is wrong. These kids might need help but don't portray them as the issue. His approach is noble towards them, but his motivation is insincere.

Commissioner Sewell thank you in advance for your prompt investigation into this matter by your Internal Affairs Unit.

Thank you on behalf of the hard-working Police Officers of the 61st Precinct and lifelong members of the community.





**Dana Rachlin**

ironic that the nypd and unions call the protesters lunatics & enemies. Its sickening to think the most diverse police force in the country has to be connected to such a hateful & racist organization. Here's a great history lesson on the PBA, Mayor Giuliani and the ever present... See More

How Police Unions Fight Reform



We are on a mission to replace over-policing with community-led public safety solutions in New York City.



EXHIBIT 2

# Beware of the Wolf in Sheep's Clothing: The Racist Branding Police Officers as Racist

| | |
|---|---|
| Name: | **Dana Rachlin** |
| Residence: | 23 Driggs Avenue #1, Brooklyn (Greenpoint), NY 11222 |
| Associated: | NYC Together, We Build the Block, Crew Count |
| Mission: | Rachlin is on a mission to brand the NYPD as engaging in a systematic racism of "over policing" in neighborhoods with minorities. Rachlin is lobbying to remove the 911 system from NYPD control and end the Gang Database. In Rachlin's own words: |

> *"For decades, many New York neighborhoods have battled the same issues – gun violence, under-resourced schools, food apartheid, lack of employment opportunities and more. Instead of strategically and intentionally investing in communities, the city of New York has invested huge amounts of money into over-policing and public safety approaches that are not working."*

| | |
|---|---|
| Charm: | Rachlin looks for opportunities to pose with officers for photos. Rachlin also uses feminine charm to gain the trust of unsuspecting officers to advance her criminal activities. Rachlin coaches and lobbies for the protection of known gang members. |
| Criminality: | Rachlin seduces police officers to gain access to NYPD databases. As friends with officers like Capt. Derby St. Fort, Rachlin has gained access to the Gang Database and shared information with known gang members resulting in a surplus of avoidable crime. |

Rachlin falsely pressed charges that on October 23, 2018, a "black" man visiting from the State of Georgia engaged in sexual advances at the Wythe Hotel, at 80 Wythe Ave, Brooklyn, NY 11249. Det. Weber from Special Victims Unit investigated the claim and closed the case after surveillance footage of the hotel revealed that Rachlin was the one making unsolicited advances onto the innocent man, including stalking, groping and pushing herself onto the man. Given Rachlin's gamesmanship bullying the NYPD, the Special Victims Unit closed the case without any charges against Rachlin.

On January 10, 2021, a member of NYC Together, a known gang member, ▮▮▮▮▮▮▮▮▮▮▮, was neutralized at the Linden Houses while in possession of a loaded firearm and threatening the safety of others. Rachlin unduly influenced the Borough Commander to omit flagging the January 10 incident as "gang member" related. Rachlin then went on Twitter to accuse the NYPD of "state & racism" and mourning that "Today I received news that One [sic] of my students was murdered."

## PLAINTIFF VERIFICATION

I, DANA RACHLIN, affirm the following to be true under the penalties of perjury:

1.  I am over 18 years of age.

2.  I am the Plaintiff in the above action, *Rachlin v City of New York, et al.*

3.  I have read the annexed Complaint, dated April 7, 2024, and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true.

Dated: 4/8/24

Signed: Dana Rachlin

DANA RACHLIN

---

STATE OF NEW YORK )

                     SS.

COUNTY OF KINGS )

On the 8th day of April in the year 2024 before me, the undersigned notary public, personally appeared Dana Rachlin, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

**MARYANNE K KAISHIAN**
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02KA0015799
QUALIFIED IN KINGS COUNTY
MY COMMISSION EXPIRES NOV. 7, 2027

Notary Public