UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

DANA RACHLIN,

                          Plaintiff,

                -against-

THE CITY OF NEW YORK, MAYOR OF THE CITY OF
NEW YORK ERIC ADAMS, NYPD CHIEF OF
DEPARTMENT JEFFREY MADDREY, NYPD
COMMUNITY COORDINATOR BRIAN ADAMS, NYPD
CHIEF OF PATROL JOHN CHELL, NYPD INSPECTOR
CRAIG EDELMAN, NYPD DEPUTY COMMISSIONER
KAZ DAUGHTRY, and NYPD MEMBERS JOHN or
JANE DOE # 1 – 5,

                          Defendants.

-------------------------------------------------------------------------X

**VERIFIED SECOND AMENDED COMPLAINT**

**Index No.:** 1:24-cv-02626

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Plaintiff, **DANA RACHLIN**, by her attorneys, **KAISHIAN & MORTAZAVI LLC**, by

**MARYANNE K. KAISHIAN,** an attorney duly licensed to practice before the United States

District Court for the Eastern District of New York, hereby complains of Defendants as follows:

PRELIMINARY STATEMENT

1.      This matter concerns Plaintiff Dana Rachlin ("Plaintiff" or "Ms. Rachlin"), who,

prior to 2021, worked with the New York City Police Department (NYPD) and high-level officials

in her role as a nonprofit Executive Director of a youth services organization and a public safety

expert. In this role, Ms. Rachlin developed strategic working partnerships with high-level City and

NYPD officials. However, following Plaintiff's observation of a series of particularly violent and

unlawful actions by NYPD members in 2019 and 2020, Ms. Rachlin began to both privately and

publicly criticize the specific NYPD perpetrators and to encourage NYPD officials, including

officials named as Defendants, to make internal changes. This advocacy coincided with and was

related to Ms. Rachlin's advocacy for alternatives to violent policing, including providing supportive services to young people at high risk of police contact, a policy Defendants opposed.

2.      Defendants took issue with the content of Ms. Rachlin's speech. In 2021 and 2022. After signaling intent to damage Ms. Rachlin's reputation in retaliation for her speech and advocacy and in an effort to chill her engagement in future protected conduct, Defendants knowingly made and disseminated multiple false statements accusing Ms. Rachlin of, *inter alia*, falsely reporting her 2017 rape and engaging in a criminal conspiracy.

3.      Plaintiff now brings the instant claims pursuant to Federal law under 42 U.S.C. § 1983 and pursuant to New York City law, including NYC Admin. Code §§ 8-107 and 10-1104 before this Court. Plaintiff's causes of action include, *inter alia*, First Amendment retaliation, First Amendment defamation, and discrimination against a victim of a sexual offense.

## PARTIES

4.      **PLAINTIFF DANA RACHLIN** is, and was at all times relevant, a lawful adult resident of Kings County in the City and State of New York.

5.      At all relevant times mentioned herein, **DEFENDANT CITY OF NEW YORK ("Defendant City" or "New York City")**, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and its employees.

6.      **DEFENDANT NEW YORK CITY MAYOR ERIC ADAMS ("Defendant Mayor Adams" or "Defendant Eric Adams")** was at all times relevant to this Complaint the Mayor of New York City. As Mayor, Defendant Mayor, at all relevant times, was an elected officer and the "chief executive officer of the city," New York City Charter § 3, and had final authority to appoint and/or remove any NYPD employees and agents, including the New York City Police Commissioner and supervisors. At all relevant times, Defendant Adams had policymaking and personnel hiring and firing authority over the Department, and constituted a policymaker for whom Defendant City is liable. Defendant Mayor Adams is sued individually and in his official capacity.

7.      **DEFENDANT NYPD CHIEF OF DEPARTMENT JEFFREY MADDREY ("Defendant Maddrey")** was, at all relevant times, an employee and supervisor with Defendant City's NYPD. Prior to December 2, 2022, Defendant Maddrey was the NYPD's Chief of Community Affairs and Housing. He was then promoted by Defendant Mayor Adams to Chief of Patrol and, on December 2, 2022, to Chief of Department In these roles, at all relevant times, Maddrey had policymaking authority over the Department. At all relevant times, Defendant Maddrey had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. Defendant Maddrey is sued individually and in his official capacity.

8.      **DEFENDANT NYPD CHIEF OF PATROL JOHN CHELL ("Defendant Chell")** was, at all relevant times, a supervisor within the NYPD. From May 3, 2019, through December 2, 2022, Defendant Chell was a First Deputy Chief with the NYPD. Beginning on or about December 2, 2022, Defendant Chell was promoted to Chief of Patrol of the NYPD. At all relevant times, including as Deputy Chief and Chief of Patrol, NYPD uniformed members of the service were obligated to obey any lawful order given by Defendant Chell. Defendant Chell is sued

in his individual capacity.

9.      **DEFENDANT NYPD DIRECTOR OF TRAINING BRIAN ADAMS ("Defendant Brian Adams")** was, at all times relevant to this Complaint, the Community Coordinator for Defendant City and the NYPD. As Community Coordinator, Defendant Brian Adams was responsible for daily administrative decision-making and personnel assignments, discipline, training, reporting, and supervision of certain NYPD and City employees within his control. Defendant Brian Adams is sued in his individual capacity.

10.      **DEFENDANT NYPD DEPUTY INSPECTOR CRAIG EDELMAN ("Defendant Edelman")** was, at all relevant times, a supervisor and Deputy Inspector within the New York City Police Department. As an NYPD supervisor, Defendant Edelman was responsible for enforcing administrative and managerial policies and procedures, including NYPD policies and applicable laws and regulations, for the individual NYPD members under his supervision. Defendant Edelman was responsible for daily administrative decision-making and personnel assignments, discipline, training, reporting, and supervision of the lower-ranking members of the NYPD within his control. Defendant Edelman is sued in his individual capacity.

11.      **DEFENDANT DEPUTY COMMISSIONER OF OPERATIONS KAZ DAUGHTRY ("Defendant Daughtry")** at all relevant times, was a Detective Specialist employed by Defendant City and its NYPD and, in this role, served as an assistant and driver to Defendant Maddrey. Defendant Daughtry is sued in his individual capacity.

12.      **DEFENDANT NYPD MEMBERS JOHN or JANE DOE # 1 – 5**, whose true identities are not yet known, are referred to herein collectively and fictitiously as "Defendant NYPD Does," or "Defendant Does # 1 – 5." At all relevant times these Defendants were employed by Defendant City as members of the NYPD.

13. At all times hereinafter mentioned, all individual Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

14. The individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise acting within the scope of their employment and/or performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

15. All Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

16. At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

JURISDICTION AND PROCEDURAL HISTORY

17. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 42 U.S.C. § 1983.

18. Venue is proper, pursuant to 28 U.S.C. § 1391, *et seq.*, in the Eastern District of New York, where a majority of the actions complained of herein occurred.

19. The monetary damages amount sought by Plaintiff exceeds $150,000.00 and exceeds jurisdictional limits of all lower courts.

20.     Plaintiff has met all conditions precedent for proceeding with her claims under Federal and New York law.

21.     As discussed further herein, Plaintiff's New York State law claims are timely filed.

22.     Plaintiff's claims are exempt from the requirements of New York General Municipal Law (G.M.L.) § 50, including the filing of a notice of claim.

23.     The instant matter is exempt from G.M.L. requirements.

24.     This matter is exempt from G.M.L. requirements for two primary reasons:

   a.  The instant matter is covered by the public interest exemption to G.M.L. § 50, as she seeks injunctive relief and the vindication of important rights violated by powerful officials, to the benefit of the public; and/or because

   b.  Individual Defendants are not *automatically entitled* to the municipality's defense as a matter of right where, as here, claims under New York State law arise from the "intentional and/or reckless" acts of Defendants. *See* G.M.L. § 50-k(3).[1]

25.     In the alternative, as discussed further in Claim for Relief VII, *infra*, Plaintiff argues that Defendants should be equitably estopped from invoking a statute of limitations defense in the instant matter, and would seek this Court's leave to file a late notice of claim upon Defendant City should such notice be deemed necessary.

---

[1] Defendant City routinely declines to represent individual employees based on facts alleging intentional misconduct; indeed, the City recently declined to provide defense to Defendants Jeffrey Maddrey and Eric Adams in matters stemming from each Defendants' respective involvement in the sexual harassment of women during their respective employment with Defendant City. *See, e.g.*, Stratman, Josephine, Daily News *Mamdani admin moves to end taxpayer-funded legal rep for former Mayor Adams in sex assault suit*, (March 16, 2026), *available at* https://www.nydailynews.com/2026/03/17/mamdani-admin-moves-to-end-taxpayer-funded-legal-rep-for-former-mayor-adams-in-sex-assault-suit/ (last visited March 30, 2026).  The City's decision to provide representation under these analogous circumstances does not make such representation required as matter of right such that Defendants might invoke the defense of G.M.L. § 50 compliance to evade liability.

26.     Plaintiff avers all claims are timely and that Plaintiff is not barred from filing for want of compliance with any applicable pre-pleading obligations.

27.     The instant matter was timely initiated with the filing of Plaintiff's Complaint on April 8, 2024.

28.     Plaintiff's First Amended Complaint was filed on December 6, 2025.

29.     On March 19, 2026, this Court granted Plaintiff permission to amend her Complaint by March 9, 2026. The instant filing follows.

30.     Plaintiff's claims have been timely filed in accordance with applicable law.

## STATEMENT OF RELEVANT FACTS

31.     Ms. Rachlin is the Executive Director of NYC Together, a foundation that provides services and care to young people who are at an increased risk of violence and other deleterious effects borne of poverty, lack of resources, and the absence of meaningful support. Ms. Rachlin is also a survivor of gender-based violence. Ms. Rachlin is also employed by the John Jay College Punishment to Public Health Department.

32.     Participants in Ms. Rachlin's programs are often the same individuals targeted and/or identified for criminal enforcement by police. Ms. Rachlin's model for the NYC Together program relied upon cooperation from the NYPD and elected officials in serving young people in the program, particularly for identification of at-risk individuals for connection to support services. Ms. Rachlin's goal was to redirect these young people to meaningful assistance rather than additional violence, including at the hands of police.

33.     For the period between approximately 2016 and 2021, including through her supervision and operation of NYC Together beginning in 2020, Ms. Rachlin developed an active system of collaboration and open dialogue with several high-ranking members of the NYPD,

including Defendant Maddrey.

### *Plaintiff's 2017 Sexual Assault*

34.     On or about October 17, 2017, Ms. Rachlin was the victim of a sexual assault by an acquaintance after an event attended by multiple members of the NYPD, including Defendant Maddrey and Defendant Daughtry. Her assailant was not a police officer.

35.     Following the assault, Ms. Rachlin attempted to contact Defendant Maddrey for help, and instead reached Defendant Daughtry, who was acting as Defendant Maddrey's assistant at that time.

36.     Ms. Rachlin requested that Defendant Daughtry ask Defendant Maddrey to call her as she was experiencing an emergency.

37.     Upon information and belief, Defendant Maddrey informed Defendant Daughtry of the nature and circumstances of Ms. Rachlin's emergency.

38.     Defendant Maddrey met Ms. Rachlin at the hospital and was allowed into the recovery room, where Ms. Rachlin was receiving medical care for serious injuries.

39.     Defendant Maddrey urged Ms. Rachlin to report the assault to the NYPD.

40.     Ms. Rachlin was initially hesitant to avail herself of the criminal legal system.

41.     Defendant Maddrey assured Ms. Rachlin to report, over her hesitancy, and assured Ms. Rachlin that the paperwork would be entered in a manner to protect her identity, using the pseudonym "Person Known to the Department," and further assured her that only Defendant Kaz Daughtry, then a detective, and two detectives from NYPD SVD would handle the investigation.

42.     According to the NYPD, Ms. Rachlin's rape kit was consistent with sexual assault and was positive for male DNA.

43.     Ms. Rachlin had visible injuries, including large and visible bruises to her neck.

44.     At least one witness, also an NYPD member, informed the NYPD that, in the aftermath of the assault, the witness overheard Ms. Rachlin's assailant apologize to her for "what happened last night."

45.     All these facts were known to Defendants.

46.     On or about October 18, 2017, two members of the NYPD's Special Victims Unit arranged a controlled phone call between Ms. Rachlin and her assailant.

47.     During this call, Ms. Rachlin, at the Detectives' urging, remained on the phone with her assailant while the target made various admissions, including acknowledging that Ms. Rachlin did not consent to any sexual acts, and as the target of the call apologized repeatedly.

48.     Upon recording multiple statements that corroborated Ms. Rachlin's account, the NYPD SVD Detectives indicated to Ms. Rachlin to end the phone call, and she complied.

49.     The NYPD SVD Detectives then celebrated and indicated to Ms. Rachlin, in sum and substance, "We got him."

50.     However, during subsequent meetings with the Brooklyn DA's Office, Ms. Rachlin was informed, in sum and substance, that NYPD Members had ended the controlled call prematurely.

51.     The Brooklyn DA's Office therefore determined that Ms. Rachlin's continued cooperation would be necessary for the prosecution of the case.

52.     Ms. Rachlin was further counseled that the prosecution of any sexual assault allegation was likely to be a lengthy and emotionally draining process for the victim.

53.     Fearing additional humiliation and trauma, and even more skeptical about the criminal legal system's ability to achieve meaningful outcomes, Ms. Rachlin ultimately determined

that she did not wish to pursue the charges against her assailant.

54.    The NYPD's paperwork indicates that Ms. Rachlin stated she did not wish to pursue the prosecution of her assailant, and that the same was communicated to Det. Weber by a prosecutor with the Brooklyn DA's Office.

55.    The NYPD paperwork further indicates that Ms. Rachlin was informed she may reopen the investigation at a future date, should she wish to. No further action was taken.

56.    The NYPD's case file indicates that the case was closed at Ms. Rachlin's request.

57.    Ms. Rachlin sought and received counselling and mental health resources for the trauma, anxiety, and fear caused by her assault and subsequent events.

58.    Ms. Rachlin did not publicize the details of her assault, did not seek civil damages against her assailant, did not otherwise publicize any details of this event, and attempted to put the assault behind her as part of her healing process.

### *2020 Conflict*

59.    In 2020, amidst and in response to the nationwide and local uprisings for racial justice, Ms. Rachlin and her partner, the late Michael K. Williams ("Mr. Williams"), founded We Build the Block, which operated as a subsidiary of, and now as a D/B/A, for NYC Together.[2]

60.    The partners also founded Crew Count, a pro-social response to the NYPD's now-infamous gang policing initiative, Operation Crew Cut.[3] Crew Count's central mission is the

---

[2] We Build the Block is a New York City-based organization bringing our community together to build the future of public safety. We create community-developed and led models proven to reduce violence and increase safety. Working with a broad coalition of partners, we support local youth, pilot new initiatives, and advocate for change. We believe that by replacing over-policing with solutions built on the block, we can protect and support our most vulnerable communities. *See* We Build the Block: About Us, *available at* https://webuildtheblock.org/about-us/.

[3] Operation Crew Cut was a dragnet-style gang-policing initiative that devastated thousands of New Yorkers, particularly those in already-marginalized and aggressively policed communities. This devastation was wrought through raids such as the deadly and ineffectual "Bronx 120" raid, where roughly half of all people arrested were subsequently determined to not be gang-involved, and the vast majority faced no serious felony charges. *See*, *e.g.*, Olivia Heffernan, *We've Got One in the Sweep*, THE APPEAL, *We've Got One in the Sweep*, July 30, 2019, *available at* https://theappeal.org/weve-got-one-in-the-sweep/ (last visited April 5, 2024); *see also* K Babe Howell, *Gang*

political empowerment of young and marginalized New Yorkers, including through voter registration initiatives.[43]

61.     These programs repeatedly demonstrated success in promoting positive outcomes for its young participants under their leadership. Particularly from 2019 through 2020, Ms. Rachlin increasingly attempted to utilize her earned credibility by identifying NYPD members whose conduct had been particularly brutal toward young New Yorkers and requesting that they be precluded from posts that required routine engagement with young community members.

62.     The violent conduct of one NYPD member in particular, Defendant Inspector Craig Edelman ("Defendant Edelman"), then the 73rd Precinct Commander, disturbed Ms. Rachlin, her program's participants, and her program's providers, as well as other community members and elected officials.[5]

63.     On or about May 15, 2020, Defendant Edelman engaged in violent conduct on a public street in Brownsville, Brooklyn, including supervising and/or participating in an incident where police pepper sprayed several small children in the face.[6]

64.     In another incident, also in Brownsville, Assemblymember Latrice Walker and City Councilmember Alicka Ampry-Samuels witnessed NYPD Police Officer Vincent D'Andraia, with and under the supervision of Defendant Edelman, search and harass a person on a public street without cause. When the elected officials voiced concern over the NYPD members' conduct,

---

*Policing: The Post Stop-and-Frisk Justification for Profile-Based Policing*, 5 U. Denv. Crim. L. Rev. 1 (2015).

[4]  *See* We Build the Block: Crew Count, *available at* https://webuildtheblock.org/about-us/ (last visited Apr 5, 2024).

[5] *See* Saki Knafo, *Bridging the Divide Between the Police and the Policed*, THE NEW YORKER, April 28, 2021, *available at* https://www.newyorker.com/news/our-local-correspondents/bridging-the-divide-between-the-police-and-the-policed (last accessed March 30, 2026).

[6] In an interview about the incident, Defendant Edelman stated, "Could children have gotten mace in their eyes? Unfortunately, yes." *Id*.

Defendant Edelman justified the abuse, claiming, "They have to learn how to respect us."[78]

65. Ms. Rachlin further observed Defendant Edelman viewing and sharing videos of shootings, police assaults, and other violence suffered by New York City residents while laughing and encouraging other members of the Department to watch the recordings for entertainment purposes.

66. Ms. Rachlin repeatedly reported Defendant Edelman's behavior to high-ranking NYPD members throughout 2019 and 2020, including Defendant Maddrey, Defendant Edelman's supervisor, and was increasingly concerned by Defendant Edelman's growing influence and apparent support within the Department.

67. During this same period, Ms. Rachlin and Defendant Chell were also in conflict, given Ms. Rachlin's criticism of Defendant Chell's history of misconduct and Defendant Chell's support for traditional policing tactics such as stop-and-frisk.

68. Defendant Chell remained in NYPD leadership, and Defendant Edelman remained in his supervisory position in the 73rd Precinct.

69. On June 4, 2020, then-Commissioner of the NYPD Dermot Shea was scheduled to appear on the radio show *Ebro in the Morning* on Hot97 hosted by Ebro Darden ("Mr. Darden").

70. The professional relationship between Mr. Darden and Ms. Rachlin was known to Defendants, including Defendants Maddrey and Edelman.

71. Ms. Rachlin communicated to Mr. Darden ahead of this scheduled interview that Defendant Edelman remained employed and empowered by the NYPD and continued to pose a

---

[7] *See* Eileen Grench and Yoav Gonen, *NYPD Cop in Protester-Shoving Left Trail of Rough Policing Complaints in Brownsville*, THE CITY, June 19, 2020, *available at* https://www.thecity.nyc/2020/06/19/nypd-cops-in-protester-shoving-ccrb-complaints-brooklyn/ (last visited April 1, 2024).

[8] The following month, Defendant Edelman supervised another violent incident in which D'Andraia threw a female Black Lives Matter protester to the ground, striking her head and causing a traumatic brain injury. Defendant Edelman is recorded watching the assault and failing to intervene or render any medical care. The lawsuit, which named Defendant Edelman, settled for $387,000.00. *See Zayer v City of New York, et al.*, 20-CV-06070 (S.D.N.Y.) (2021).

threat to New Yorkers, and that his appointment to a leadership position in the 73rd Precinct in Brownsville had been objected to by multiple elected officials and community members.

72.     During the interview, Mr. Darden asked Commissioner Shea about the continued employment and advancement of Defendant Edelman in the Department.[9]

73.     After the broadcast interview, on June 5, 2020, Commissioner Shea immediately reassigned Defendant Edelman. Defendant Edelman was replaced by Deputy Inspector Terrell Anderson in the 73rd Precinct, publicly known to be a proponent of community-led policing.

74.     Though the move was an elevation for Defendant Edelman within the Department, given his new role as a supervisor in the citywide Gun Violence Suppression Division, his transfer and replacement was understood by Defendants to be disciplinary in nature and enraged other Defendants, including Defendant Chell and Defendant Edelman himself.

75.     These Defendants correctly deduced that Ms. Rachlin had informed Mr. Darden about the ongoing conflict regarding Defendant Edelman's assignment, an allegation that Ms. Rachlin did not refute.

76.     In texts sent to Ms. Rachlin on or about June 5, 2020, referencing the Hot97 interview, Defendant Maddrey stated, "The minute Ebro asked about Edelman, everyone spoke your name. That wasn't a good move."

77.     On or about the evening of June 5, 2020, Defendants, including Defendant Maddrey, held a meeting of Brooklyn North Precinct Commanders and other NYPD members, believed to include Defendant Daughtry, during which time these Defendants warned these

---

[9] Mr. Darden asked, "Black police officers have come to you regarding the removal of Craig Edelman and Vincent D'Andraia. They feel ignored. What's going on there?" Commissioner Shea responded, in relevant part, "No one is being ignored. I've had many conversations with elected officials and community leaders, about several incidents, including that one, and they will be thoroughly investigated promptly, and the appropriate measures will be taken. And if they are not, then that's on me." *Full interview available at*: https://www.youtube.com/watch?v=8rL3QpGLxMo. (last visited March 30, 2026).

commanders not to permit Ms. Rachlin to enter NYPD precincts or continue her work in their jurisdiction. Defendants barred Ms. Rachlin from accessing public spaces, including public precinct locations.

78.    In June 2020, during a separate meeting with NYPD subordinates, Defendant Chell stated, in sum and substance, "[Ms. Rachlin] should know we can humiliate her at any time."

79.    Also in June 2020, shortly after this meeting, Defendant Chell directed a subordinate to share this information with Ms. Rachlin, which this subordinate did.

80.    Though Ms. Rachlin was unaware as to what information Defendant Chell purported to possess, she understood that Defendant Chell intended to harm her reputation.

2021 Conflicts

81.    Defendants' conduct following the June 2020 events hindered Ms. Rachlin's ability to reach participants and conduct community events in Brooklyn North, specifically Brownsville, Brooklyn, and significantly impacted her professional work.

82.    Ms. Rachlin was denied from and/or chilled in seeking grants and community partnerships and was forced to rearrange her practice to avoid areas where she was at stated risk of reprisal by Defendants. Ms. Rachlin was denied access to police precincts and other public accommodations.

83.    However, Ms. Rachlin was determined to continue to work to conduct healing circles, voter registration events, and other services for We Build the Block participants. Ms. Rachlin sought to accomplish this by introducing and/or fostering NYC Together programs in other locations in Kings County, including Sheepshead Bay.

84.    Ms. Rachlin conducted this work with the assistance and participation of NYPD Captain Derby St. Fort, whose 61st Precinct Command included Sheepshead Bay.

85.     As a result of the threats against her and her inability to access public spaces within the NYPD's 73rd Precinct's catchment area, Ms. Rachlin had relocated her program to this area. As detailed in an April 28, 2021, *New Yorker* article, Captain St. Fort had been second-in-command to Defendant Edelman during his tenure in the 73rd Precinct.[10] There was fallout between Captain St. Fort and Edelman around Captain St. Fort's support for violence interruption models that did not rely exclusively on police.[11]

86.     Several NYPD sources, including Defendant Edelman, provided interviews prior to the long-form, approximately 7,800-word *New Yorker* article's publication and were quoted on the record regarding the tensions and conflicts within the 73rd Precinct.[12]

87.     Upon information and belief, having been asked for comment and/or otherwise informed of the article's pending publication by early April, Defendants Maddrey, Chell, Edelman, and Daughtry were aware that the *New Yorker* was investigating the events giving rise to Defendant Edelman's ouster and believed Ms. Rachlin to be responsible for public scrutiny into the issues Defendants intended to quash in 2020.

88.     The article and related external investigation reignited Defendant's anger regarding Ms. Rachlin's 2020 conduct, namely her perceived responsibility for sparking Defendant Edelman's transfer and the resulting appointment of Inspector Terrell Anderson, a proponent of "community-led" policing, to the post in the 73rd Precinct.[13]

89.     Defendants escalated their retaliation against Ms. Rachlin.

---

[10] Saki Knafo, *Bridging the Divide Between the Police and the Policed*, THE NEW YORKER, April 28, 2021, *available at* https://www.newyorker.com/news/our-local-correspondents/bridging-the-divide-between-the-police-and-the-policed ("Unfortunately, violence interrupters were not viewed as legitimate by many of my peers," St. Fort told [Saki Knafo], in an e-mail. "I decided to lean on the community, even though it felt like a risk to my professional career.")
[11] *Id,*
[12] *Id*.
[13] *Id*.

April 8, 2021

90.     Shortly before the article's publication, on April 8, 2021, Reverend Kevin McCall ("Rev. McCall"), a pastor and social justice advocate, requested to meet with Ms. Rachlin.

91.     Ms. Rachlin accepted the meeting, anticipating that Rev. McCall wanted to discuss community initiatives. The two met in a diner in Kings County.

92.     Instead of discussing a collaboration, Rev. McCall initiated the conversation by informing Ms. Rachlin that, in sum and substance, if she did not admit to what she had "done," he was prepared to destroy her reputation using his social media platforms.

93.     Ms. Rachlin did not understand the this threat and asked McCall to explain.

94.     Upon information and belief, Defendant Brian Adams, then the NYPD's Community Coordinator, and Defendant John Chell, then the NYPD's Deputy Chief, falsely informed Rev. McCall and other community advocates that Ms. Rachlin's reported rape had been fabricated in its entirety, and that Ms. Rachlin had attempted to falsely accuse a Black man of rape.

95.     Defendants further falsely stated to Rev. McCall that the NYPD had closed Ms. Rachlin's claim because she was proven to have falsely reported her rape.

96.     Defendants further falsely claimed that Defendant Chell had personally conducted the controlled call between Ms. Rachlin and her assailant and falsely claimed that the call exonerated its target.

97.     Based on this information, Rev. McCall informed Ms. Rachlin that he was, in sum and substance, "on to her," and would ensure that no community partners would work with her.

98.     In the face of these defamatory allegations and the damage done to her reputation, Ms. Rachlin felt that she had no choice but to divulge to Rev. McCall the deeply personal and traumatizing details of her assault in a humiliating scene in a public diner.

99.      Over the next two years, Ms. Rachlin would be forced to recount the brutal details of her rape repeatedly due to Defendants' conduct, as Defendants, believed to include Defendants Brian Adams, Chell, and Does # 1 – 5, continued to make these defamatory claims against Ms. Rachlin to an unknown number of other individuals after April 8, 2021.

100.    On or about April 8, 2021, Mr. Williams notified Ms. Rachlin that he, too, had been informed by Defendants, including Defendant Brian Adams, that Ms. Rachlin had falsely reported her rape and that the NYPD had declined to pursue the rape claim for this reason.[14]

101.    Defendants' campaign also extended far beyond Ms. Rachlin's trusted inner circle and significantly impacted Ms. Rachlin's personal and professional life.

102.    Indeed, after April 8, 2021, Defendants, or individuals to whom they had disseminated these defamatory claims against Ms. Rachlin, conveyed these claims to individuals in at least two Crisis Management Sites, including employee(s) with the Center for Justice Innovation (CJI), and Brownsville In, Violence Out (BIVO), as well as elected officials upon whom Ms. Rachlin's professional work relied.

103.    Also on April 8, 2021, following the news that NYPD members had spread defamatory statements to multiple individuals and community partners, Ms. Rachlin called Defendant Maddrey given his knowledge of the details and veracity of her 2017 rape.

104.    During this call, Ms. Rachlin informed Defendant Maddrey that, several years after her rape, NYPD members had spread false and damaging information about this assault in retaliation for her work and advocacy, including in opposing the tactics of Defendant Edelman, and that she was aware that Defendants, including Chell and Daughtry, were involved in the dissemination of these statements.

---

[14] On September 6, 2021, Michael K. Williams died at age 54 in Brooklyn, New York.

105.     During this call, Ms. Rachlin pleaded with Defendant Maddrey to put an end to this defamation campaign against her by Defendant Maddrey's subordinates within the NYPD.

106.     Ms. Rachlin implored, "You saw me when I sat in the hospital, and I was crying, and I told you I didn't want to call the police. And I didn't want to do a report. And you said, Dana, look at your neck. You have handprints on your neck, you have to do a report."

107.     Upon information and belief, Defendant Maddrey affirmed Ms. Rachlin's recollection of these events because he knew them to be true.

108.     Defendant Maddrey further assured Ms. Rachlin that she had done the right thing by reporting her rape, recalled witnessing the aftermath of her assault in the hospital, and stated, "You absolutely were not making false allegations."

109.     Defendant Maddrey further stated, "I will call John Chell and see what he has to say…I'll talk to the people on this side. Like I said if they had anything, any part of this, it will be put to an end."

110.     Then, in a text sent on April 12, 2021, Defendant Maddrey wrote, "I spoke to everyone on my side, there will be no further issues." However, Defendant Maddrey failed to supervise and/or intervene in the conduct of his subordinates.

111.     There were further issues.

2022 Conflict and Letters

112.     On February 4, 2022, We Build the Block and NYPD Captain St. Fort were the subjects of a widely-circulated *New York Times* article touting the Captain's program involvement and its effect on its young participants as an alternative to violent, arrest-and-incarcerate policing.

113.     Defendants were aware of Ms. Rachlin's direct involvement in the publication of this story and its focus on her organization's work.

114.     The central purpose of the article was to advocate for the efficacy of Ms. Rachlin's preferred method of non-violent, community-based services and responses to crime, and was contrasted with methods of policing at the center of the 2020 and 2021 conflicts with Plaintiff.

115.     Shortly thereafter, on or about February 22, 2022, a single-spaced, two-page letter signed "on behalf of the hardworking members of the NYPD 61st Precinct" was sent to elected officials and religious leaders as well as community members. *See* **Exhibit 1**.

116.     Upon information and belief, the letter was manually placed inside of the property lockers of multiple NYPD members.

117.     These lockers are in an area restricted to NYPD personnel.

118.     The letter was mailed to various addresses of community members within the 61st Precinct using the United States Postal Service (USPS).

119.     The letter was mailed to multiple New York City elected officials, including, but not limited to, citywide officials and representatives within the 61st Precinct zone in Kings County.

120.     These letters were also mailed via USPS to NYPD officials, including Commissioner Keechant Sewell, NYPD Deputy Scott Henderson, and NYPD Deputy Commissioner Chauncey Parker.

121.     In addition to other allegations made against Ms. Rachlin, Captain St. Fort, and certain community members and participants engaged in We Build the Block, the letter accused Ms. Rachlin of falsely reporting her rape. *Id*.

122.     The letter falsely alleged that Ms. Rachlin had engaged in consensual sex with her assailant before pursuing a false rape allegation against him. *Id*.

123.     The letter further falsely claimed that the NYPD and Brooklyn DA's Office had both closed the case and proven that Ms. Rachlin had falsified her allegation. Both claims are

demonstrably and materially false.

124.    The letter claimed that all information contained in the letter was verified by NYPD records. *Id*.

125.    Defendants' harmful conduct targeting Ms. Rachlin continued.

126.    On or about April 15, 2022, a second letter was received via mail by multiple individuals, including members of the NYPD such as Brooklyn North Executive Officer Defendant Scott Henderson. *See* **Exhibit 2**.

127.    The memo was written in the format typically used in an NYPD operations directive or "49 Memo."

128.    The memo was titled, "Beware of the Wolf in Sheep's Clothing: The Racist Branding Police Officers as Racist." *Id*.

129.    In the memo, Defendant(s) reiterated the demonstrably false claims that Ms. Rachlin accused an innocent Black man of rape and that the NYPD had closed the case after its investigation clearly exonerated this person. *Id*.

130.    However, Defendant(s) included distorted details taken from internal NYPD paperwork, such as the identity of NYPD Detective Weber. This intentional act by Defendants lent undue credibility to these demonstrably false accusations.

131.    Defendant(s) falsely claimed that Ms. Rachlin had directly caused a "surplus of avoidable crime" by accessing the NYPD's Gang Database and sharing the classified information contained therein with individuals for criminal purposes. *Id*.

132.    Defendant(s) included Ms. Rachlin's home address and listed her as "affiliated" with NYC Together, We Build the Block, and Crew Count. *Id*.

133.    Defendant(s) falsely accused Ms. Rachlin of engaging in *quid pro quo* exchanges

of sex with NYPD members for information about program participants. The memo included a section titled "Charm" to discuss these false allegations and to accuse Ms. Rachlin of using "feminine charm" to elicit information for criminal purposes.

134.   Defendant(s) criticized Ms. Rachlin for making a social media post mourning the shooting death of a program participant, a young man whose death the memo describes as being "neutralized."

135.   This social media post was specifically shared and criticized in texts sent by Defendant Brian Adams to Defendant Chauncey Parker, after it was shared by Defendant Craig Edelman to Defendant Brian Adams via text messages on NYPD phones.[15]

136.   In previous interdepartmental texts, received in a 2023 FOIL disclosure, Defendant Brian Adams shared additional screenshots of posts by Ms. Rachlin criticizing violent policing.

137.   In separate messages, Defendant Brian Adams shared these posts and assured Defendant Edelman and NYPD Member Chauncey Parker that he would "be speaking to all the bosses about her." Defendant Brian Adams further told Defendant Edelman to "keep his head up."

138.   Defendant Brian Adams further engaged in multiple text exchanges with Rev. Kevin McCall regarding Ms. Rachlin, which included screenshots of Ms. Rachlin's social media. Interdepartmental texts further reveal NYPD members discussing Ms. Rachlin's employment by John Jay College, the name of her supervisor, and the program's involvement in the Brownsville Safety Alliance (BSA) in text messages. Defendants have actively opposed Ms. Rachlin's involvement in the BSA as part of their retaliation campaign, significantly hindering her work and

---

[15] As discussed above, the NYPD withheld all IAB files and related records in response to Ms. Rachlin's pre-filing FOIL requests. Upon information and belief, at least one IAB investigation is ongoing, and Ms. Rachlin was interviewed for the first time by investigators on April 1, 2025. For this reason, though Plaintiff has received text messages, emails, and other information via FOIL request, including the messages referenced here, these disclosures are not comprehensive, and Plaintiff does not yet know the extent of these communications between Defendants and/or other individuals.

threatening her employment.

139.    Upon information and belief, in addition to slandering Ms. Rachlin through verbal statements, calls, and communications with multiple individuals, Defendants, including, but not limited to, Defendants Brian Adams, Craig Edelman, John Chell, and Kaz Daughtry, and Defendant Does # 1 – 5, authored and/or supplied information for and/or disseminated the letter(s) and/or memo(s) containing known false and defamatory statements about Ms. Rachlin.

140.    No Defendants intervened or prevented the violations perpetrated against Ms. Rachlin despite possessing the requisite knowledge and opportunities to do so.

141.    Defendant Maddrey knew of the abusive conduct of his subordinates and was aware of the defamatory nature of the claims these subordinates made against Ms. Rachlin, but failed to intervene, properly report, discipline, or otherwise mitigate the harm done to Ms. Rachlin despite possessing the knowledge and opportunity to do so.

142.    Upon information and belief, Defendants Maddrey, Chell, Brian Adams, and/or Does # 1 – 5 knowingly made false statements designed to chill Plaintiff's speech, including by specifically targeting Plaintiff for humiliation and abuse in response to Plaintiff's engagement in protected conduct, including free speech and association, to Plaintiff's professional contacts and/or members of the public, on or about April 8, 2021,

143.    Upon information and belief, Defendants Chell, Brian Adams, and/or Does # 1 – 5 knowingly made false statements for this same purpose in written correspondence that was mailed to elected officials on or about February 22, 2022.

144.    Upon information and belief, Defendants Chell, Brian Adams, and/or Does # 1 – 5 knowingly made additional false statements for this purpose in written correspondence that was mailed to elected officials on or about April 15, 2022.

145. Upon information and belief, these actions were undertaken with the material support and/or at the behest of Defendants Edelman and Daughtry.

146. Upon information and belief, Defendant Daughtry shared information gleaned through his involvement in the investigation into Ms. Rachlin's rape with Defendants.

147. Defendant City, by its policymakers, failed to safeguard Ms. Rachlin's private information regarding her sexual assault from misappropriation by NYPD members, failed to train and/or supervise Defendant City's agents responsible with investigating gender-based violence and maintaining private victim information, knowingly failed to discipline and continued to employ Defendants despite full knowledge that these Defendants, as Defendant City's employees, would subject individuals such as Plaintiff to violations of their constitutional rights.

Damages

148. Defendants have caused Ms. Rachlin to suffer significant damage and loss and have deprived Ms. Rachlin of her liberty and property interests.

149. Defendants caused, and continue to cause, serious damage to Ms. Rachlin's reputation, which is integrally tied to Ms. Rachlin's professional work as a community program and service provider, a John Jay employee, and independent nonprofit executive, and which has materially affected Ms. Rachlin professionally.

150. Defendants discouraged Ms. Rachlin from taking public-facing roles to further her organization's work and forced Ms. Rachlin to change the location of her programming to her organization's detriment, reduced participation, and pecuniary loss.

151. Defendants caused Ms. Rachlin to be precluded from consideration for grants and/or contracts generated and/or approved by Defendant City.

152. Defendants chilled Ms. Rachlin's constitutionally protected conduct by discouraging

her from seeking professional opportunities for fear of being forced to share the details her sexual assault and defend the veracity of her valid claims.

153.   Defendants induced community partners and government actors to refuse to work with Ms. Rachlin by damaging her reputation.

154.   Defendants disseminated Ms. Rachlin's home address in a false and inflammatory memo, intentionally creating a direct threat to Ms. Rachlin's safety.

155.   Defendants caused Ms. Rachlin to expend significant costs on home security systems, moving costs, and depriving her of the quiet enjoyment of her home.

156.   Defendants forced Ms. Rachlin to expend costs rebranding her organization, crisis management, public relations, and image rehabilitation, the costs of which continue to accrue.

157.   Defendants further caused Ms. Rachlin emotional and psychological damages, including anxiety, difficulty sleeping, humiliation, fear of physical harm, emotional anguish, depression, distress, and post-traumatic stress, for which Ms. Rachlin has been forced to seek medical care and expend costs.

158.   The full extent of Ms. Rachlin's injuries and damages are not yet known, and their effects are ongoing.

### FIRST CLAIM FOR RELIEF

**Defamation or Stigma "Plus"**
***Against Defendants Maddrey, Chell, Daughtry, Edelman, and Does # 1 – 5 Pursuant to <u>42 U.S.C. § 1983</u> and the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Defendant City Pursuant to* Monell v Social Svcs. (*436 U.S. 658 [1978]*)**

159.   Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

160.   Defendants, in their capacity as government actors, violated Ms. Rachlin's rights under the "defamation plus" doctrine, including, *inter alia*, Defendants' Maddrey retaliatory

creation and dissemination of a policy precluding Ms. Rachlin from entering NYPD precincts.

161.    Defendants' statements, and the circulation of the same, were sufficiently derogatory to injure Plaintiff's reputation, were capable of being proven false, and were all identified as false by Plaintiff.

162.    In addition to knowingly creating and/or knowingly disseminating defamatory statements, letter(s), and memo(s), Defendants, each governmental employees and/or agents and/or policymakers, imposed a material state-imposed burden or state-imposed alteration of the Plaintiff's status or rights.

163.    Plaintiff suffered both a loss of reputation—including loss of standing directly resulting from spurious claims of fabricated sexual assault, criminal activity, and racially motivated false charges—coupled with the deprivation of her liberty and/or property interests.

164.    These statements were undertaken by Defendants in an attempt to retaliate against and to humiliate and/or silence and/or intimidate Ms. Rachlin, and to chill her participation in future public discourse, including through her professional work, and did so.

165.    These defamatory statements include, but are not limited to, false statements made by Defendants Brian Adams and John Chell, and/or Defendant NYPD Does # 1 – 5, to Rev. Kevin McCall, on or about April 8, 2021.

166.    These defamatory statements were further made to additional individuals with influence over Ms. Rachlin's reputation and professional work, including on or about April 8, 2021, and thereafter.

167.    The substance of the knowingly false statements made by Defendants Brian Adams, John Chell, and/or Defendant Does # 1 – 5 on or about April 8, 2021, include:

    a.  The demonstrably false claim that Ms. Rachlin fabricated the facts and circumstances of her rape, including its very occurrence;

b. The demonstrably false claim that Ms. Rachlin attempted to frame a Black man for this crime, and had done so due to his rejection of her and due to her apparent racial animus;

c. The demonstrably false claim that Ms. Rachlin was recorded during a controlled call conducted by Defendant Chell, and, as such, according to Defendants, Defendant Chell was therefore an authority as to the veracity of Ms. Rachlin's rape allegation; and

d. The demonstrably false claim that the NYPD-recorded call was exonerative for the perpetrator.

168.    Members of the NYPD, including Defendant Does # 1 – 5, further authored and disseminated defamatory letter(s) and memo(s) against Ms. Rachlin containing further defamatory allegations. *See* **Exhibit 1** (February 2022 Letter) and **Exhibit 2** (April 2022 49-Memo).

169.    These defamatory statements included the statements above, and further include, but are not limited to, the following false statements made by Defendants Brian Adams, John Chell, and/or Defendant Does # 1 – 5, in letters authored by Defendant(s) in February 2022 and April 2022, respectively:

a. The demonstrably false claims that Ms. Rachlin fabricated the facts and circumstances of her rape, including the fact of its occurrence;

b. The demonstrably false claim that Ms. Rachlin attempted to frame a Black man for this crime, and had done so due to his rejection of her and due to her apparent racial animus;

c. The demonstrably false claim that this false allegation was initiated when Ms. Rachlin had attempted to seduce a man who had rejected her, resulting in no sexual act occurring whatsoever, even despite DNA evidence to the contrary;

d. The demonstrably false claim that Ms. Rachlin's case was closed because the NYPD determined that the allegations were false, when this information is refuted by the NYPD's own paperwork generated in relation to the case, and when such paperwork states that Ms. Rachlin was encouraged to reconsider her decision not to proceed;

e.   The demonstrably false claim that Ms. Rachlin attempted to utilize the NYPD to commit this crime without the NYPD's interest in investigating this issue;

f.   The demonstrably false claim that Ms. Rachlin insisted that the investigation take place over the objection of the NYPD;

g.   The demonstrably false claim that the NYPD had terminated the case against her due to proof she had not been raped, and, indeed, that she had actually been rejected by the man she accused; and

h.   The demonstrably false claim that Ms. Rachlin was engaged in criminal gang activity.

170.   Details of Ms. Rachlin's sexual assault, which were collected by NYPD members during the NYPD's investigation, including the fact of the assault and ensuing NYPD investigation, that Ms. Rachlin participated in a controlled call, and the race of the person she identified, were disseminated along with false and derogatory statements for the purposes of defaming Ms. Rachlin by Defendant members of the NYPD, believed to include Defendant Brian Adams, Defendant John Chell, Defendant Kaz Daughtry, and Defendant Does # 1 – 5.

171.   Defendants shared Ms. Rachlin's private home address as part of this defamatory correspondence. *See* **Exhibit 2**.

172.   Defendants falsely stated that: Ms. Rachlin had fabricated the fact of her rape, that she had actively attempted to seduce the man she accused before this false accusation, that she had falsely accused a Black man due to rejection and racial animus, that she had engaged in criminal conduct to access confidential police information, including information stored in the NYPD's Gang Database, for criminal purposes, and that she had committed crimes related to evidence tampering. *See* **Exhibits 1 and 2**.

173.   These statements were provided to third parties, including elected official(s), known to include at least one elected official in Kings County, to community members, to members of the NYPD, and to other individuals with influence over Ms. Rachlin's professional work and

reputation.

174.    Defendants' statements were provably untrue and were disseminated throughout Ms. Rachlin's personal and professional networks.

175.    Defendants' defamatory conduct described herein deprived Ms. Rachlin of property and liberty interests. These interests include, but are not limited to:

a.  Professional opportunities, contracts, and collaborative agreements related to Plaintiff's work as a community service provider and nonprofit executive;

b.  Ms. Rachlin's ability to conduct her work in public spaces within the 73rd Precinct's geographic area and to enter public spaces within the building;

c.  Ms. Rachlin's reputation, which is directly tied to her professional work as a credible provider of services intended to mitigate dangers posed to young people;

d.  Plaintiff's relationships with community partners and/or funders in connection to Plaintiff's professional work;

e.  Reduced funding for community-based work;

f.  The right to enter the area encompassed by the 73rd Precinct, including the entire neighborhood of Brownsville, Brooklyn, without fear of reprisal;

g.  The right to enter any NYPD precincts and other police-controlled public accommodations; and

h.  The interest in Plaintiff's enjoyment of her property and her home, the address for which was circulated by Defendants in connection with these claims.

176.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**SECOND CLAIM FOR RELIEF**

**Municipal Liability for Constitutional Violations Alleged Herein**

***Pursuant to the First, Fourth, Ninth, and Fourteenth Amendments to the United States Constitution Against Defendant City Pursuant to* Monell v Social Svcs. *(436 U.S. 658 [1978])* *and* 42 U.S.C. § 1983**

177.    Plaintiff incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

178.    The facts pleaded above describe the policies, practices, and customs to which Defendant City subjected Plaintiff, resulting in the deprivation of Plaintiff's constitutional rights, including, *inter alia*:

> I. Failing to train and/or supervise NYPD members responsible for investigating gender-based violence and sexual assault;
>
> II. Failing to discipline and/or investigate Defendants despite full knowledge and certainty that these Defendants, as Defendant City's NYPD employees, would subject individuals such as Plaintiff to violations of their constitutional rights; and
>
> III. Creating and promulgating a policy and/or practice whereby NYPD members can access internal and sensitive NYPD files using "ghost access" and/or non-traceable methods preventing the user's digital activity on NYPD servers from being tracked and logged.

179.    Wrongful acts or omissions complained of herein were carried out by the individual named and unnamed NYPD member defendants pursuant to the above-described policies, practices, and customs.

180.    These acts were carried out in accordance with formal policies, rules, and procedures of Defendant City, actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant Mayor Eric Adams, customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City by its agents, Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

181.    Plaintiff was foreseeably and preventable denied her constitutional rights as a result of these policies and/or practices and/or customs, and Defendant City is therefore liable pursuant to *Monell v Social Svcs* (*436 U.S. 658 (1978*) for:

**I.      Failing to Train and/or Supervise NYPD Members Responsible for Investigating Gender-Based Violence and Sexual Assault**

182.    All individual Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Ms. Rachlin's injuries.

183.    Defendant City, by its policymakers, knew that Defendant NYPD Members were likely to violate the constitutional rights of individuals who had been victims of gender-based violence.

184.    Defendants know that NYPD Members are certain to regularly encounter circumstances described herein, including investigating an incident involving sexual assault, interacting with victims of gender-based violence, handling sensitive and private victim information, and being subjected to criticism related to their conduct while on duty, through the course of their employment.

185.    Defendant City knew that there is a history of wrongful conduct in these scenarios by NYPD Members.

186.    Defendant City further knew that training and/or supervision could ameliorate the potential harms of constitutional violations in these scenarios, including civil rights violations and physical and emotional injuries.

187.    Nevertheless, Defendant City, by its policymakers, agents, and officials, failed to train its agents and/or employees regarding their conduct during the scenarios described herein and further failed to supervise its agents and/or employees when engaged in high-risk contact.

188.    By failing to train and supervise Defendant NYPD Members, these Defendants exhibited a conscious disregard and/or deliberate indifference for the risks posed by NYPD members' conduct absent adequate training and supervision.

189.    These risks are well-documented, and were known by Defendant City and its policymakers at the time of Ms. Rachlin's injuries.

190.    In 2018, The New York City Council introduced a host of bills that mandated sexual sensitivity and assault investigation training for members of the NYPD in the wake of information about the Department's treatment of sexual assault victims.[16] However, at a Council hearing in 2021, it was clear that these issues persisted.[17]

191.    In 2018, the Civilian Complaint Review Board (CCRB) announced that the scope of the problem of sexual misconduct including assault by members of the NYPD necessitated an expansion of CCRB rules to allow the independent oversight agency to investigate such complaints, and the CCRB Board adopted this change by unanimous vote in February 2018.[18]

192.    For decades the CCRB had referred all sexual misconduct cases to the NYPD's Internal Affairs Bureau (IAB), requiring victims interface entirely with the NYPD itself, and no information about any investigations, discipline, or outcomes were made public.

193.    Defendant City's persistent failure to investigate and discipline NYPD employees for misconduct has resulted in a culture where accountability is lacking. This ongoing issue undermines public trust and perpetuates the risk of further violations.

194.    Despite repeated calls for reform, Defendant City has not implemented sufficient measures to address these deficiencies in oversight. The lack of transparency in disciplinary proceedings continues to be a significant concern for victims and advocates alike.

195.    Indeed, Ms. Rachlin has filed two Freedom of Information Law requests since 2022

---

[16] *Id.*

[17] *Id.*

[18] New York City Civilian Complaint Review Board, NYC Civilian Complaint Review Board Votes Unanimously to Investigate Allegations of NYPD Sexual Misconduct, via Press Release (Feb 15, 2018) *available at* https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/news/pressreleases/2018/20181502_boardmtg_sexualmisconduct_release.pdf.

seeking the release of related IAB file(s), but the file(s) and related records have not been disclosed.

196.    Although Ms. Rachlin's 2017 assault was not perpetrated by an NYPD member, Defendants' actions against her constitute sexual misconduct and are intrinsically related to her status as a victim of sexual abuse.

197.    The NYPD's Patrolmen's (or Police) Benevolent Association also moved to block the CCRB's expansion.[19] Ultimately, after reintroducing the proposed rules in a manner consistent with the First Department's holding in *Lynch v Civilian Complaint Review Board*,[20] the agency officially undertook these investigations in December 2020. Plaintiff incorporates by reference the information contained in the Civilian Complaint Review Board's data regarding the agency's investigations.[21]

198.    On June 30, 2022, the US Department of Justice announced that it was initiating an investigation into the NYPD's mishandling of sexual assault investigations and the mistreatment of the victims of gender-based violence by the Department, including the Special Victims Division (SVD).

199.    This announcement came after numerous victims of sexual assault whose cases had been mishandled by the NYPD and who had been mistreated when attempting to pursue their claims with the Department sent a letter describing their ordeals to the DOJ.

200.    This mishandling includes pervasive instances of the mishandling and misuse of private information of victims of sexual assault.

201.    The DOJ determined that the documented history of these issues within the NYPD necessitated the "comprehensive review of the policies, procedures and training for SVD

---

[19] *Matter of Lynch v New York City Civilian Complaint Review Bd.*, 2020 NY Slip Op 03062 (1st Dept 2020).
[20] *Id.*
[21] New York City Civilian Complaint Review Board (December 8, 2021) *December 8, 2021 Public Board Meeting*, minutes available at: https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/board/2021/Minutes/12082021_boardmtg_minutes.pdf

investigations of sexual assault crimes, including how SVD interacts with survivors and witnesses, collects evidence and completes investigations; any steps NYPD has taken to address deficiencies in its handling of sexual assault crimes; how SVD allocates staffing and other resources; and the services and support offered to survivors of sexual assault.

202.    The NYPD's failure to train, including the failure to train on the confidential handling of victim information, directly resulted in harms Ms. Rachlin experienced.

## II.    Failing to Investigate and/or Discipline NYPD Employees

203.    Defendant City has been faced with a pattern of misconduct by Defendants NYPD members but has failed to discipline these NYPD members, thus acquiescing in or tacitly authorizing Defendant City's employees' unlawful actions.

204.    Defendant City had pre-incident notice of Defendants' propensities for constitutional harms.

205.    Individual Defendants have demonstrated a propensity for the constitutional harms caused to Plaintiff, including a propensity for violating the civil rights of civilians, placing the protection of NYPD members above upholding their duties as police officers, engaging in sexual misconduct, and failing to intervene in misconduct.

206.    This history of misconduct extends to Defendants Maddrey, Chell, Brian Adams, and Edelman.

207.    These respective histories of significant individual misconduct include, but are not limited to:

   a. A civil jury's finding in *Bovell v City of New York, et al*., establishing that Defendant Chell made false statements under oath regarding the circumstances under which he killed Ortanzso Bovell by determining that Chell intentionally killed Mr.

Bovell;[22]

b. The sexually abusive conduct of Defendant Brian Adams, including, but not limited to, incident(s) in which he exposed his erection and behaved in a sexually coercive manner to female coworkers in the workplace, and retaliated against at least one woman who refused his advances, as documented in complaints filed by two women with the Equal Employment Opportunity Commission;

c. The Civilian Complaint Review Board's determination that Defendant Maddrey abused his authority in the matter of KB, KM, and BS, in which three children in Brooklyn were chased for seven minutes by a retired NYPD officer while he brandished a gun, and where Defendant Maddrey voided his former NYPD colleague's arrest;

d. A civil settlement in *Zayer v City of New York, et al.*, 20-CV-06070 (S.D.N.Y.) (2021) against Defendant Edelman, in which video evidence showed that he directly supervised the assault and resulting traumatic brain injury of a protestor without intervening, providing aid, or issuing discipline to the assailant officer;

e. Multiple misconduct complaints against Defendant Edelman even prior to the June 2020 assault, including the wrongful search and harassment of a person witnessed and reported by two elected officials;[23] and

f. Widespread allegations of sexual misconduct and/or the mishandling of private and/or protected information by Defendants.

208.    Defendant City has had notice of Defendants' documented histories of misconduct but has failed to make any meaningful investigation into these charges.

209.    Defendants were not disciplined by Defendant City or its NYPD for these acts.

210.    As a policy or *de facto* policy, the NYPD does not impose discipline on malfeasant officers. *See Floyd, et al. v. City of New York*, 08-CV-1034 (AT), *Ligon, et al. v. City of New York, et al.*, 12-CV-2274 (AT), and *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT); Federal Monitor's September 19, 2024, Report to the Court on NYPD Misconduct and Discipline.[23] In

---

[22] *See* Eileen Grench, *NYPD 'Accidental' Killer Cop's Rise to Brooklyn Chief Questioned*, THE CITY, April 15, 2021, *available at* https://www.thecity.nyc/2021/04/15/nypd-accidental-killers-rise-to-brooklyn-chief-questioned/ (last visited April 2, 2024).
[23] *Available at* https://www.nypdmonitor.org/wp-content/uploads/2024/09/Discipline-Report.pdf.

fact, a review by the Federal Monitor found that the Department departs from Civilian Complaint Review Board recommendations for discipline in <u>most</u> instances of substantiated NYPD misconduct. Id. These matters and related reports are incorporated by reference.

211.    The Federal Monitor's report found a widespread pattern of NYPD's failure to discipline its employees, even in cases where independent investigations substantiated misconduct and recommended discipline. "[The Civilian Complaint Review Board] recommended discipline for 56.6% of its substantiated complaints but the Police Commissioner imposed a [Command Discipline] or accepted charges for fewer than 22.4% of CCRB's substantiated complaints. Even then…the fact that a CD was accepted or charges were filed in the 22.4% of the substantiated cases, does not mean that any penalty was actually imposed for those officers. Reports by CCRB or NYPD that 'discipline was imposed' when nothing more was done than to direct 'Training,' 'Instructions,' or 'warnings' lends to inflated 'concurrence' estimates. It is not uncommon for CCRB to recommend CD with Training and find the case resolved with 'Training' alone.'"[24]

212.    This widespread failure as illustrated by the Federal Monitor's report extended to the individual Defendants' harm to Ms. Rachlin in this case, where several individual Defendants who violated her rights each had substantiated histories of past complaints that the NYPD failed to act on.

213.    Defendant City, by Defendant Mayor Adams, who has final authority to terminate NYPD employees pursuant to New York City law, had notice of these and all prior instances of misconduct by individual NYPD Defendants, but repeatedly failed to terminate these individuals, and has instead repeatedly promoted them within the NYPD. These actions are so egregious, and pose such a likelihood of future harm, that they rise to the level of deliberate indifference.

---

[24] *Id.*

214.    As a result of these failures, Plaintiff suffered actual damages for which Defendant City is liable.

### III.    Permitting NYPD Members Such as Defendants to Utilize "Ghost Access" to Enter Sensitive NYPD Files

215.    Defendant City permits a practice known within the New York City Police Department as "ghost access."[25]

216.    "Ghost access" is a method for accessing internal NYPD files whereby the user leaves no known digital footprint concerning their activities.

217.    Typically, any digital NYPD file has an associated "access log" similar to the manual logging practice utilized for hard copy files.

218.    This access log records the identity of the person accessing the file along with the time and frequency of such access.

219.    "Ghost access" permits a user to access an investigative file and the information contained therein without having such access included in the file's access log or being otherwise traceable.

220.    There is no publicly available information concerning the NYPD's ghost access policies.

221.    There is no legitimate law enforcement justification for the existence of ghost access.

222.    Even if there was a legitimate law enforcement justification, the ghost access policy was implemented without adequate safeguards to prevent the exact misuse that occurred here.

223.    Plaintiff first became aware of the existence of ghost access in June 2025.

224.    Plaintiff was informed about the existence of ghost access by a member of law

---

[25] The practice is sometimes referred to, somewhat paradoxically, as "no-peek access."

enforcement investigating the allegations contained in the instant Complaint.

225.    Plaintiff was informed in June 2025 that this law enforcement entity was being prevented from fully investigating the access history of Plaintiff's investigative file because of the NYPD's ghost access policy.

226.    Upon information and belief, Plaintiff avers this practice is not limited to Internal Affairs Bureau staff.

227.    In or around 2017, while present in the NYPD's 94th Precinct, Plaintiff requested a copy of a document in her file from a senior member of the NYPD. Plaintiff witnessed this individual utilize an NYPD computer to access the case file.

228.    This individual is not present on the access log associated with Ms. Rachlin's rape investigation file and provided to Plaintiff by Defendant City's NYPD.

229.    This individual was not an IAB member at the time of the observed access.

230.    Plaintiff has endeavored to gain further insight as to the nature, methods, and extent of this policy and practice but has been rebuffed by Defendant City by its New York City Police Department.

231.    On September 29, 2025, Plaintiff filed a Freedom of Information Law request upon the NYPD seeking further information as to this policy and practice.

232.    The NYPD provided an anticipated determination date of February 12, 2026. The NYPD made no determination or disclosures on this date and did not request an extension of time to respond.

233.    Plaintiff considered this lack of response to constitute a constructive denial of her request.

234.    Plaintiff appealed the NYPD's constructive denial of her request on March 18,

2026, in accordance with P.L.O. 87.

235.    On March 30, 2026, Plaintiff's appeal was "granted" to the extent the NYPD provided itself a new deadline of August 6, 2026, by which to either respond to or deny Plaintiff's information request.

236.    Plaintiff has not received any responsive records to date.

237.    The misuse of private and/or sensitive information contained in police files is foreseeably certain to result in constitutional violations, abuse, and serious harm.

238.    The likelihood for this misuse absent stringent use restrictions and transparency is high.

239.    Defendant City, by its NYPD agents and/or employees, is aware that its policy permitting clandestine and untraced access of internal files is certain to result in civil rights violations.

240.    Nevertheless, Defendant City has permitted and promulgated this policy.

241.    The City's failure to disclose records of this ghost access policy itself evidences consciousness of the constitutional deficiencies of this policy.

242.    Defendant City cannot claim that it lacked knowledge regarding the likely harms of its policies and/or procedures concerning police file access, including violations of victims' constitutional right to privacy.

243.    The NYPD's electronic files contain the sensitive information of crime victims and countless civilians, the disclosure and misuse of which poses real threats to the wellbeing and constitutional rights of these individuals.

244.    These dangers of the misuse of the information contained within police files and databases—and the foreseeable dangers of failing to prevent such misuse—are well-established,

as evidenced by, *inter alia*:

    a. The Public Oversight of Surveillance Technology (POST) Act

        i. NYC Admin. Code 14-188 (governing NYPD's reporting requirements concerning data use and transparency policies to ensure the safety of protected groups whose information is collected by law enforcement).

    b. New York State Victims' Rights Protections

        i. N.Y. Civ. Rights Law § 50-b(1) (barring disclosure of information related to the identity of a victim of a sex offense);

        ii. N.Y. Exec. Law § 108 (Address Confidentiality Program);

        iii. N.Y. Crim. Proc. Law § 60.42 (Rape Shield Law); *see also id.* at § 60.43 (limiting the admissibility of evidence of a victim's sexual conduct in non-sex offense cases); and

        iv. N.Y. Pub. Off. Law § 87(2)(b) (barring disclosure of private information); *see also* § 89(2) (providing examples of what constitutes an unwarranted invasion of personal privacy).

    c. New York City's Acceptable Use Requirements[26]

        i. "City employees do not have a right of privacy while using any of the City's office and technology resources, whether for official or personal purposes, at any time, including while accessing the Internet or using email."

        ii. Prohibiting " personal use of the City's office and technology resources in the unauthorized acquisition, use, reproduction, transmission, or distribution of any information, computer software or data, including,

---

[26] The City of New York, Policy on Limited Personal Use of City Office and Technology Resources, *available at* https://www.nyc.gov/assets/coib/downloads/pdf2/aup-final-issued-version.pdf (last visited March 30, 2026).

without limitation: private or confidential information about any individual, business or other entity."

d. History of Misuse by NYPD and Law Enforcement

i. In 2012, former NYPD officer Gilberto Valle was arrested for planning to torture, kill, and cannibalize approximately 100 women whose information he had used internal NYPD data to identify and locate.

ii. In 2016, NYPD Detective Lori Campbell was arrested and charged for stalking, harassing, and violating a restraining order against a romantic partner, and used the NYPD's internal file database to locate her victim.[27]

iii. In 2025, NYPD Detectives Richard Arve and Raymond Ramos were charged with bribery for charging fees to conduct searches of internal NYPD data.[28]

iv. In 2016, the Associated Press released an analysis from all 50 states finding widespread misuse of confidential police databases by department members: "[The] investigation found police officers across the country abuse confidential law enforcement databases to get information on romantic partners, business associates, neighbors, journalists and others for reasons totally unrelated to police work. In the worst cases, officers have stalked, harassed and tampered with criminal cases using details obtained through criminal history and motor vehicle databases."[29]

---

[27] Fonrouge, Gabrielle. THE NEW YORK POST, *Former cop busted after violating ex-girlfriend's protection order* (April 12, 2019) *available at*: https://nypost.com/2019/04/12/former-cop-busted-after-violating-ex-girlfriends-protection-order/ (last visited March 30, 2026).
[28] NBC Staff. NBC, *Retired cop searched NYPD database to send info to friend in bribery scheme: DA,* (April 15, 2025), *available at*: https://www.nbcnewyork.com/news/local/crime-and-courts/retired-cop-unauthorized-searches-nypd-database-brooklyn-new-york-city/6226063/ (last visited March 30, 2026).
[29] Associated Press Staff. THE ASSOCIATED PRESS, *A look at police abuse of confidential databases nationwide* (Sept

245.    In instances where system access was logged and documented, this information can be, and has been, utilized to prosecute perpetrators of harm and to end such misuse.

246.    Conversely, in instances where system access is shielded from discovery and oversight, efforts at accountability and protection are frustrated, and abuse may continue.

247.    Upon information and belief, Defendants utilized "ghost access" to enter, download, and/or obtain information from Ms. Rachlin's sensitive police investigation file into her 2017 rape.

248.    By failing to maintain a chain-of-custody record for internal files as a matter of policy and practice, Defendant City has failed to prevent, discourage, or mitigate the misuse of sensitive victim information and has caused the entirely foreseeable harms suffered by Plaintiff.

249.    By failing to maintain a chain-of-custody record for internal files as a matter of policy and practice, Defendant City has permitted Defendants to take advantage of the uncertainty and lack of transparency surrounding internal file access.

250.    By failing to maintain a chain-of-custody record for internal files as a matter of policy and practice, Defendant City has concealed the identities of malfeasant NYPD members, permitting these individuals to evade accountability and perpetuating harms against victims, resulting in harms including the trauma and secondary trauma suffered by individuals such as Plaintiff.

251.    By creating and/or promulgating such policies and practices, and through failing to train, discipline, and supervise Defendants as described herein, Defendant City has caused Plaintiff to suffer injuries as a result of Defendants' violations of her constitutional rights pursuant to 42 U.S.C. 1983, including:

---

28, 2016), *available at:* https://apnews.com/article/9ae07c50b68242fe90eafb09a8a3d68d (last visited March 30, 2026).

a. The violation of Plaintiff's constitutional right to privacy pursuant to the First, Fourth, Ninth, and Fourteenth Amendments to the United States Constitution; and

b. The violation of Plaintiff's First Amendment rights.

252. Accordingly, Defendant City is liable to Plaintiff for these injuries.

## THIRD CLAIM FOR RELIEF

### First Amendment Retaliation

*Against All Individual NYPD Defendants Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution and Against Defendant City Pursuant to* **Monell v Social Svcs.**

253. Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

254. Defendants imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in making Plaintiff the victim of hostile, defamatory, and violent public harassment campaign, in encouraging violence and/or retaliation against Plaintiff by releasing her personal address and private information, in interfering with Plaintiff's investors and/or partners and/or business interests, in subjecting Plaintiff to Defendants' harmful policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

255. Defendants further engaged in retaliation against Plaintiff for engaging in speech and/or conduct protected by the First Amendment and concerning matters of public interest, including, *inter alia*, Plaintiff's protected conduct in:

a. Criticizing Defendants' positions regarding the lack of discipline for NYPD members who commit acts of violence and the continued subjection of New Yorkers to the same;

b. Speaking to member(s) of the media about the violent conduct of Defendant Craig

Edelman and/or Defendant Chell, and/or encouraging others to do so, including as related to media coverage on Hot97, in *The New Yorker* and/or *The New York Times*;

c. Publicly opposing the promotion of Defendant Edelman and Defendant Chell in the wake of their respective public acts of violence;

d. Associating with individuals who lawfully challenged Defendants' policies;

e. Publicly supporting initiatives including "community-based policing" initiatives and supportive services for young people subjected to police enforcement; and

f. Associating with individuals for the purpose of community engagement, the Brownsville Safety Alliance, Crew Count, Heal the Violence, and/or other civic and community engagement.

256. Upon information and belief, on or about April 8, 2021, Defendants Chell, Brian Adams, and/or Does # 1 – 5 knowingly made false and defamatory statements to Plaintiff's professional contacts designed to chill Plaintiff's speech, specifically targeting Plaintiff for humiliation and abuse related to her sexual assault in retaliation for Plaintiff's engagement in protected conduct.

257. Upon information and belief, Defendants Chell, Brian Adams, and/or Does # 1 – 5 knowingly made false statements for this same purpose in written correspondence that was mailed to elected officials on or about February 22, 2022.

258. Upon information and belief, Defendants Chell, Brian Adams, and/or Does # 1 – 5 knowingly made additional false statements for this purpose in written correspondence that was mailed to elected officials on or about February 22, 2022.

259. Upon information and belief, Defendants Chell, Brian Adams, and/or Does # 1 – 5 knowingly made additional false statements for this purpose in written correspondence that was mailed to elected officials on or about April 15, 2022.

260. Defendants engaged in the acts and omissions complained of herein to prevent or

discourage Plaintiff from continuing to engage in such protected speech and/or conduct. Plaintiff's engagement in protected conduct was in fact chilled.

261. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of her First Amendment rights.

262. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

263. Upon information and belief, Defendants did not subject others similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

264. Plaintiff suffered actual harm and chill, including in that Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident, including her right to be lawfully present in public spaces and/or to associate with neighbors and members of his community; and/or suffered adverse effects on her protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

## FOURTH CLAIM FOR RELIEF

### Failure to Intervene
***Against All Individual Defendants Pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Ninth Amendments to the United States Constitution***

265. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

266. The Defendant City, by its agents, had a special duty to Plaintiff and possessed

sufficient knowledge that inaction would lead to the harms suffered by Plaintiff.

267.   Defendants witnessed and/or knew of the harmful conduct of fellow Defendants, and knew or should have known that such conduct violated Plaintiff's rights.

268.   Defendants in supervisory roles, including Defendants Mayor Adams, Maddrey, and Chell, knew of and failed to intervene in the harmful conduct of their supervisees.

269.   Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants take any steps to intervene in the abusive and/or constitutionally and legally deficient conduct of their colleagues.

270.   Despite possessing the notice and reasonable opportunity to intervene, Defendants merely observed and/or unreasonably ignored such conduct against Plaintiff.

## FIFTH CLAIM FOR RELIEF

### Protection from Gender-Based Violence
*Against Defendants City, Maddrey, Chell, Brian Adams, and NYPD Does # 1 - 5 Pursuant to NYC Admin. Code § 10-1102, et seq.*

271.   Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

272.   In 2018, the New York City Council enacted NYC Admin Code, Title 10, Ch. 11, § 10-1102, *et seq.* (Actions by Victims of Gender-Based Violence) in recognition of the fact that "gender-motivated violence inflicts serious physical, psychological, emotional and economic harm on its victims."

273.   The section provides a private right of action to victims of gender-based violence in recognition of the public's interest in addressing and redressing these acts of harm.

274.   This provision defines "crime of violence" as "an act or series of acts that would

constitute a misdemeanor or felony against the person as defined in state or federal law or that would constitute a misdemeanor or felony against property as defined in state or federal law if the conduct presents a serious risk of physical injury to another." § 10-1102.

275.    Defendants' conduct constitutes a criminal offense under, *inter alia*, the New York State Penal Law (PL) § 240.30(1)(A) (Harassment in the Second Degree, a Class A Misdemeanor) and the Title 18 U.S. Code § 876 (Mailing Threatening Communications).

276.    Defendants' conduct, including by intentionally including Ms. Rachlin's personal address, including her apartment number, in widely disseminated defamatory documents, carried "the risk of physical injury" and constitutes a crime of violence under this provision. § 10-1103.

277.    Defendants' conduct was committed because of Plaintiff's gender or on the basis of gender, and due, at least in part, to an animus based on Plaintiff's gender. § 10-1103.Under NYC Admin. Code § 10-1102, *et seq*., a victim of gender-based violence may pursue a private right of action, in addition to any other cause of action to which they are entitled to damages, against the perpetrator(s) of any such crime of violence against them.

278.    Plaintiff is therefore entitled to damages, including actual and punitive damages, as well as injunctive and declaratory relief, against Defendants.

279.    As a result of the conduct described herein, Plaintiff was deprived of her liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, was forced to expend costs, and was otherwise damaged and injured.

280.    On January 29, 2026, New York City Council passed Intro. 1297, which provided that "any person who brought a claim or cause of action on or after March 1, 2023 but on or before March 1, 2025 that would satisfy the requirements of [Admin. Code § 10-1102, et seq.] may amend or refile such claim or cause of action to add a cause of action pursuant to this section." Admin.

Code § 10-1104.1.

281.    This section further provides retroactive liability for acts occurring on or before January 9, 2022. § 10-1104.1.

282.    This section further permits Plaintiff to hold Defendant City liable for her injuries for its role in enabling, participating, and/or conspiring in the actions against her.

283.    This section does not require the conduct perpetrated by Defendants to constitute a "sexual offense" as defined by the New York State penal law to be actionable but rather requires that such conduct be "of a sexual nature." *Id*.

284.    Accordingly, Defendants are liable to Plaintiff for actual and punitive damages, attorney's fees, and injunctive relief.

285.    Plaintiff seeks injunctive relief intended to benefit herself and the public at large in light of the offenses committed by Defendants against her.

286.    The injunctive relief sought by Plaintiff includes, but is not limited to:

   a. Ending the policy of "ghost access" or other non-traceable file access for individuals accessing internal NYPD files;

   b. The establishment of a privacy policy for internal NYPD files restricting access to sensitive information to specific individuals assigned to investigate the matter;

   c. Revoking so-called "good guy" letters permitting Defendants, as former NYPD members, to carry firearms following retirement or resignation from the police department in light of Defendants' demonstrated propensity to commit harm, including gender-motivated harm;

   d. Filing Extreme Risk Protection Orders, or so-called red-flag laws, to disarm Defendants pursuant to C.P.L.R. 6342;

   e. Seeking to terminate the employment of Defendants Brian Adams and Craig Edelment, the Defendants who remain employed by Defendant City's NYPD with

significant access to sensitive information and authority over civilians as members of law enforcement; and

f.  Further training and policy change to the NYPD's Special Victim's Division to improve, *inter alia*, the Department's investigations, treatment of victims, and storage of sensitive information.

287.  Punitive damages are necessary to advance the purpose of this section as enacted, and Defendants' conduct is so extreme as to warrant an award of such damages.

## SIXTH CLAIM FOR RELIEF

### Unlawful Discrimination and/or Retaliation
*Against Individual NYPD Defendants Pursuant to <u>NYC Admin. Code § 8-102</u>, et seq., and <u>§ 8-502</u>*

288.  Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

289.  The NYCHRL has a mandatory liberal construction requirement.

290.  As described herein, Ms. Rachlin was a victim of a sex offense classified under <u>P.L. § 130</u> and is protected under this provision from discrimination and retaliation based on her status. *See* <u>§ 8-102</u>.

291.  As described herein, Defendants refused Ms. Rachlin free and equal access to a public accommodation in a manner constituting unlawful discrimination. *See* <u>§§ 8-107(4), 8-107(28)(b)</u>.

292.  As described herein, Defendants retaliated against Plaintiff for engaging in protected conduct under this provision. *See* <u>§ 8-107(7)</u>.

293.   Plaintiff is entitled to pursue an action for damages pursuant to <u>§ 8-502.</u>

294.  Plaintiff may maintain this claim against members of the police department, as the protections invoked by Plaintiff arise from Chapter 1 of the Title, including <u>§ 8-107</u>.

295.    Plaintiff has not commenced an action with the New York City Human Rights Commission or any State or Federal Agency such that the instant Complaint would be preempted or tolled by any competing action.

296.    Plaintiff timely served a copy of this Complaint upon the agency.

297.    Due to Defendants' conduct in violating these provisions of the New York City Civil Rights Law, Plaintiff is entitled including punitive damages, injunctive relief, and such other remedies as may be appropriate, in addition to all other damages to which she is entitled.

## SEVENTH CLAIM FOR RELIEF

**Defamation Under New York State Law**
*Against Individual Defendants and Against Defendant City Pursuant to* **Respondeat Superior**

298.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

299.    Defendants, at all relevant times, were each Defendant City's agents and/or employees.

300.    All Defendants other than Defendant Former Mayor Adams were members of the New York City Police Department.

301.    Defendants, at all relevant times, were each acting within the scope of their employment at the time of the acts described herein.

302.    Defendants authorized these letters and memos using NYPD resources, including NYPD format memos, NYPD phones, and NYPD internal placement, thereby leveraging official NYPD resources and authority.

303.    In the alternative, and to the extent Defendants are determined to have been acting outside of the scope of their employment, Defendant City is further liable for the negligent hiring,

training, and supervision of Defendants causing the injuries suffered by Plaintiff.

304.    Defendant City is liable because Individual Defendants propensity for such misconduct was known.

305.    In making defamatory statements concerning Plaintiff, Defendants caused injuries to Plaintiff by engaging in:

      I.    Defamation *per se*; and

     II.    Defamation *per quod*.

306.    Such claims are not time barred, as the doctrines of both republication and equitable tolling apply to the instant matter.

307.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## I. Defamation *Per Se* Under New York State Law

308.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

309.    Defendants' statements tended to injure Plaintiff's trade, business, and/or profession.

310.    Defendants knew these statements to be false.

311.    Defendants made these statements intentionally to damage Plaintiff's standing, to negatively affect Plaintiff's credibility, and to protect Defendants' own reputation.

312.    Defendants' statements were capable of being proven false.

313.    The investigative findings in the NYPD case files maintained by Defendants establish these statements as false.

314.    Defendants' statements were identified as false by Plaintiff.

315.    Defendants recognize the false allegations levied against Plaintiff to be harmful and potentially dangerous.

316.    Such statements were levied against Plaintiff for the express reason that they are patently harmful.

317.    Defendants' defamatory statements further constitute defamation *per se* because, in addition to being false and defamatory, such statements impute unchastity and/or sexual misconduct to the female Plaintiff.

318.    Defendants acted with actual malice against Plaintiff by intentionally making—and republishing—defamatory statements concerning Plaintiff.

II.    **Defamation *Per Quo* Under New York State Law**

319.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

320.    Though Plaintiff has sufficiently pled that Defendants' statements each constitute distinct instances of defamation *per se*, in the alternative, Plaintiff has suffered sufficient special damages, including professional damages, reduced earning potential, future lost income, and further special damages, such that Defendants' defamatory statements constitute defamation *per quod*.

321.    Defendants' statements, and the circulation of the same, were sufficiently derogatory to injure Plaintiff's reputation.

REPUBLICATION

322.    Defendant's defamatory written statements made in February 2022 and April 2022, respectively, described above, constitute republication of Defendant's defamatory verbal statements made in April 2021, also described above.

323. All such statements were false, known to Defendant to be false, were inherently damaging due to their content, and caused damage to Plaintiff.

324. The false premises of Defendant's defamatory statements are described elsewhere herein and include, *inter alia*, that Plaintiff falsified the fact of her rape and falsely accused a person of rape—Plaintiff was in fact raped, exhibited visible injuries, and correctly identified her assailant to police.

325. Defendants knowingly made false, defamatory, and damaging statements and induced a third party to confront Plaintiff and convey threats to Plaintiff in April 2021 by making these slanderous statements intentionally to defame, harm, retaliate against, and silence Plaintiff.

326. Defendant reiterated these false statements defaming Plaintiff in February 2022 by intentionally using a different method, specifically sending libelous statements via mailing to public figures and community members.

327. These statements by Defendants did not constitute mere recirculation of Defendants' prior defamatory statements.

328. Defendants' defamatory statements were modified in form and content when compared to the earlier defamatory statements.

329. Defendants reiterated these false claims defaming Plaintiff using different language and further embellishing their false claims against Plaintiff.

330. Defendants' February 2022 statements were intended to, and did, reach a new, broader audience than their April 2021 statements.

331. Defendant reiterated and further embellished these false statements defaming Plaintiff in April 2022 by intentionally engaging with a different method and audience, specifically sending libelous statements via mailing to new recipients, including within the NYPD.

332. These statements by Defendants did not constitute mere recirculation of Defendants' prior defamatory statements.

333. Defendants' defamatory statements were modified in form and content when compared to the earlier defamatory statements.

334. The April 2022 statement contained both restatements of defamatory claims and entirely new defamatory claims, and was provided in a new format, specifically one mirroring a commonly utilized NYPD memo format intended to heighten a reader's credulity.

335. Defendants republished false claims defaming Plaintiff using different language and by further embellishing their false claims against Plaintiff.

336. Accordingly, the statute of limitations for these earlier statements by Defendants was renewed through their continued tortious conduct against Plaintiff.

337. The total extent, full nature, and number of instances of Defendants' defamatory statements is not yet known, and Plaintiff is not yet aware of whether subsequent further statements might afford her an even later statute of limitations.

338. Nevertheless, the facts as known to Plaintiff establishes that the claims against Defendants began to accrue with the republication of defamatory statements in the memo disseminated on or about April 15, 2022.

<u>EQUITABLE ESTOPPEL</u>

339. Defendants, including Defendant City, should be estopped from utilizing a statute of limitations defense in the instant matter.

340. Plaintiff has established that she diligently sought to pursue the claims against Defendants.

341. Plaintiff has further established that such pursuit was knowingly frustrated by the

actions of Defendant City itself, by its agents and/or employees, including individual Defendants, who each concealed essential facts to Plaintiff's claims.

342. Furthermore, Plaintiff relied on Defendants' active misrepresentations and was induced by and reasonably relied on such representations, including Defendant Maddrey's April 12, 2021, text to not immediately pursue litigation.

343. Defendants had superior knowledge of the facts in this case and actively concealed these facts, especially of ghost access policies, via FOIL delays, misrepresentations, and incomplete disclosures.

344. Plaintiff promptly filed suit once concealed facts became accessible.

345. Ms. Rachlin first sought information to pursue a civil case against Defendants in October 2022.

346. Ms. Rachlin has continuously and diligently sought information regarding her claims, including throughout the pendency of the instant matter.

347. As described above, Plaintiff has further diligently sought information concerning "ghost access" since she first became aware of Defendant City's practice in June 2025, but Defendant City's NYPD has afforded itself a determination date nearly one (1) year after Plaintiff's request was served.

348. This obstruction closely mirrors Defendant City's response to Plaintiff actively and diligently seeking information concerning Defendants' conduct from Defendant City and its NYPD agents and/or employees beginning in 2022.

349. Plaintiff sought to ascertain Defendants' respective conduct and involvement in the instant matter and to identify the individuals who may have accessed her investigative file to violate Plaintiff's right to privacy and to wrongfully utilize information contained therein against

her.

350.    Plaintiff was traumatized and fearful of further retaliation by Defendants, which initially prompted Plaintiff to attempt to avoid potential conflict by seeking further information about their behavior.

351.    Plaintiff further suffered the death of her partner, Michael K. Williams, in September 2021.

352.    However, Plaintiff initiated a diligent search for information concerning her harms while still within the applicable statute of limitations, as discussed *supra*.

353.    Plaintiff filed a Freedom of Information Law (FOIL) request concerning this information in October 2022, within one (1) year of the applicable statute of limitations.

354.    Defendant City, by its NYPD agents and/or employees, refused to provide responsive records.

355.    Ms. Rachlin filed a FOIL request in October 2022.

356.    Ms. Rachlin's FOIL request was repeatedly delayed and ultimately denied by the NYPD in violation of NY Pub 87 and the FOIL law.

357.    Plaintiff was forced to engage in Article 78 litigation to compel Defendant City's disclosure of responsive records.

358.    Ms. Rachlin filed suit to compel compliance on April 15, 2023.

359.    Ms. Rachlin reached a settlement with the NYPD that was so-ordered on July 5, 2023. This settlement required the NYPD to produce responsive records that were not specifically covered by the FOIL exemption.

360.    The first disclosure following this agreement was made on July 13, 2023, and consisted only of an access log.

361. Plaintiff's original request sought an accounting of the individuals who accessed Plaintiff's investigation file.

362. Upon receipt of Defendant City's incomplete disclosures provided on July 13, 2024, Plaintiff observed the access log to her file.

363. This log was incomplete and included only a small number of individuals, including the originally assigned SVD detectives and a supervisor for administrative purposes.

364. At the time of both wrongful denial of Plaintiff's lawful FOIL request and Defendant City's limited responsive disclosures, Defendant City, by its agents and/or employees, was aware that this limited access log was not a complete accounting of the individuals who accessed Plaintiff's file.

365. Plaintiff is now aware that this list is not a complete record of individuals who accessed her case file.

366. Additional disclosures, including the republished letter at issue, were not disclosed until August 18, 2023. This disclosure also included text messages between Defendants concerning the Plaintiff, including the plans to conspire against her as noted in her Complaint.

367. Plaintiff continues to diligently pursue information concerning her case, though the minimal disclosures released in dribs and drabs between July and August 2023 provided the basis to file the instant suit pursuant to 42 U.S.C. 1983 and the New York City Admin. Code.

368. However, as a result of concealment by Defendants and Defendant City's agents/employees, the one (1) year statute of limitations for New York State defamation claims that accrued beginning in April 2022 had already passed by the time even incomplete disclosures were made by Defendant City.

369.    Defendant Maddrey was the Chief of the NYPD throughout this search for records, and was aware of and notified of this search, and delayed and prevented compliance with the same.

370.    Each Defendant was aware of and notified of this search and request for records, and delayed and prevented compliance with the same.

371.    Plaintiff initiated the instant suit on April 8, 2024.

372.    Defendant City has permitted Defendants, including Defendant City itself, to benefit from the concealment afforded by its NYPD's no-trace digital policies.

373.    Upon information and belief, Defendants utilized ghost access to access Plaintiff's files, intentionally rendering the timing, nature, and extent of access presently unknowable to Plaintiff.

374.    Defendant City, by its agents and/or employees, has continued to obfuscate and conceal the identities of the individuals responsible for the injuries suffered by Plaintiff.

375.    To permit Defendants, including Defendant City, to take advantage of its own concealment and harmful policies would permit Defendants to take advantage of their own wrongs.

376.    The significant and unique nature of Plaintiff's claims, her diligent pursuit of information concerning the same, and the egregious pattern of behavior by Defendants support equitably estopping Defendants from invoking a timeliness defense to avoid litigating the merits of the case against them.

377.    Accordingly, Defendants should be equitably estopped from invoking a timeliness defense against Plaintiff's claims.

## EIGHTH CLAIM FOR RELIEF

**Violations of Plaintiff's Constitutional Right to Privacy**
***Against all Defendants Pursuant to <u>42 U.S.C. 1983</u> and the First, Fourth, and Fourteenth***

*Amendments to the United States Constitution  and Against Defendant City Pursuant <u>to</u> <u>Monell v Social Svcs</u> (436 U.S. 658 [1978])*

378.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

379.    Plaintiff provided details of her sexual assault, sexual preferences, and private life to police when reporting the fact of her rape and the surrounding circumstances.

380.    Plaintiff has a reasonable expectation of the privacy of information within her private investigative file.

381.    Individual Defendants accessing and using this information to harm here constitutes a seizure under the Fourth Amendment.

382.    Furthermore, Plaintiff had a constitutionally protected interest in avoiding disclosure of personal matters under the Fourteenth Amendment.

383.    Such information was maintained within police files within Defendants' possession and control.

384.    Such information was further reported by Plaintiff to Defendant Maddrey in his role as a law enforcement officer.

385.    Defendants, through the actions described herein, accessed, utilized, and publicized this private intimate information for the express purpose of harming, humiliating, retaliating against, silencing, and/or otherwise injuring Plaintiff.

386.    Plaintiff, as a victim of a crime of gender-motivated and sexual violence, had an interest in the privacy of information provided to Defendants for law enforcement purposes.

387.    This improper publication of private information constituted a violation of Plaintiff's

constitutional right to privacy.

388.   Such conduct caused harm to Plaintiff as described herein, including humiliation, fear, reputational harm, emotional and psychological anguish, secondary trauma compounding the effects of Plaintiff's sexual assault, damage to Plaintiff's livelihood, and fear for Plaintiff's physical safety, forced Plaintiff to expend costs, forced Plaintiff to move, and otherwise caused injuries and damages to Plaintiff, the full extent of which are not yet known.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff respectfully seeks relief from this Court and demands judgment against the individual Defendants and the City of New York in the following forms:

  i.   Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

  ii.  Actual damages in an amount to be determined at trial against Defendant City;

  iii. Statutory attorney's fees, disbursements, punitive damages, actual damages, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, NYC Admin. Code §§ 10-1104 and 8-502; and

  iv.  Such other relief as the Court deems just and proper.

**Dated:**    Brooklyn, New York
              April 6, 2026

                              **KAISHIAN & MORTAZAVI LLC**
                              Attorneys for Plaintiff

                              By: _____
                              Maryanne K. Kaishian
                              55 Washington Street, Ste. 461
                              Brooklyn, New York 11201
                              T: (347) 662-2421
                              E: eservice@kaishianlaw.com

Dear Commissioner Sewell,

We respectfully request your immediate attention to a very alarming and dangerous act of serious misconduct. It has come to the attention of residents of the 61 Precinct that there was a potential serious violation and act of misconduct by Capt. Derby St. Fort, The Commanding Officer of the 61st Precinct. This past event was shared with us by Police Officers from the 61, Officers who are stunned, concerned, and have lost all desire to work for the Captain. Here is the story.

On December 31, 2021 Police Officers were watching a social media platform and saw a young man they identified a █████ ████, a gang member, inside of bar called Club Midst on Coney Island Ave. At this time ██ ████ was streaming live holding a gun. When these Police Officers showed Captain St. Fort he instructed a Lieutenant and some officers to go to the club, BUT not to touch ████████ He told them to check the bar and spook the kids. When they arrived, they checked the club, and observed Mr. ████ in the club but did not touch him as ordered. They walked through the club and left. Later, the social media post disappeared. It is alleged that Capt. St Fort is friends with ████████ and called to warn them. Why would the Captain risk the lives of his Officers? Why would he leave a gun in our community? Why would he protect a gang member? Gun violence in our city is out of control! Many NYPD cops have been shot and killed this year. If this story is true, Capt. St. Fort should be disciplined and removed from his post.

It has been pointed out to us that Captain St Fort is part of an organization called We Build The Block. This organization helps kids out of gang violence. We believe there was a story on this recently in the Times and profiled on WPIX 11. He has 15 kids from Public Housing he talks to and gives them money in an effort to keep them away from violence. ████████ is one of his 15 kids. Mr. ████ is part of a gang whose members caused a shooting in Kings Plaza. It is the opinion of many Police Officers in 61 Precinct that Capt. St. Fort didn't want to tarnish his program and could protect Mr. ████ from being arrested with a gun. However, he couldn't hide the shooting in Kings Plaza by another one of his group's kids.

We decided to look closer at the "We Build the Block Program" and discovered it's run by a woman named Dana Rachlin. It appears on her social media she is from Staten Island and has inserted herself as an advocate of social justice issues within the African American community. However, from our research she appears to have disdain for the NYPD that is clearly demonstrated on her social media. She recently openly mocked a $600,000 basketball court built for Harlem children by the NYPD. Prior to Capt. St Fort's appointment at the 61st Precinct, we had never heard of Ms. Rachlin, nor had she expressed any interest in our community. Why is a person who hates NYPD policies involved in a partnership with an NYPD Captain? Why is she welcomed into our facilities? It's hard enough for our officers to work in a tough environment and yet they must interact in the sanctity of their Precinct with a person who despises them!

It has now come to our attention that Ms. Rachlin's hatred towards the NYPD stems from an incident that occurred in Fall 2018. After a fundraiser hosted by Ms. Rachlin on behalf of NYC Together, she admitted to an opioid and alcohol laced evening, and she accused a guest of a heinous crime. She said this alleged crime was committed by an African American man. Due to the work of your Detectives and the District Attorney's Office this crime was proven to be fabricated through inconsistent statements and video proof. Ms. Rachlin made a phone call to once again try to trap this innocent male but that failed. Ms. Rachlin was instructed to withdraw her complaint. To this day she denies that these events ever happened. We are told this is all documented in the NYPD reports. Ms. Rachlin was willing to send another innocent African American to jail for her own gain. What a disgrace! Lastly, her romantic involvement with Capt. St Fort is public knowledge. This relationship is clearly clouding his judgment, and it has become the motive for their anti-police policies.

It's remarkable that we have an African American Commanding Officer who is romantically involved with a fraudulent privileged white female Community Activist who hates the NYPD. An activist who is allowed access to our facilities, our officers, and children we are trying to help. Would anyone want their children around someone who takes opioids? A person who hates us and portrays our hard-working cops as oppressors of the

**EXHIBIT 1, Page 1 of 2**

African American community? YET, she had zero issues with trying to implicate an innocent African American male to raise her community "victim" status and take advantage of a Me-Too Movement. A movement that many women have suffered great pain for. How can we allow Capt. St Fort to continue to work with her? This is wrong! We need genuine people to help our city, not people who want to serve themselves on the backs of downtrodden communities.

Again, if this is true, the Captain is more concerned about his image and growth in the department, above the safety of his officers and the community. He should be removed immediately.

Capt. St Fort is focusing his program towards a very minuscule part of African American Community in the 61st Precinct. The community is primarily Caucasian, Asian, Russian, Irish, and Jewish. Is he putting his energy into them as well? It appears he is portraying that the very small African American population of young kids is the crime issue in our community. This alone has a racial component. Most of the crime in our community is being committed by Caucasian males who suffer from opioid abuse. Does he have a program built for them? Or is it they are privileged, and his efforts will not be rewarding for his career. Making these young males a platform for his progression is wrong. These kids might need help but don't portray them as the issue. His approach is noble towards them, but his motivation is insincere.

Commissioner Sewell thank you in advance for your prompt investigation into this matter by your Internal Affairs Unit.

Thank you on behalf of the hard-working Police Officers of the 61st Precinct and lifelong members of the community.






# EXHIBIT 1, Page 2 of 2

# Beware of the Wolf in Sheep's Clothing: The Racist Branding Police Officers as Racist

**Name:**   **Dana Rachlin**

**Residence:**   23 Driggs Avenue #1, Brooklyn (Greenpoint), NY 11222

**Associated:**   NYC Together, We Build the Block, Crew Count

**Mission:**   Rachlin is on a mission to brand the NYPD as engaging in a systematic racism of "over policing" in neighborhoods with minorities.  Rachlin is lobbying to remove the 911 system from NYPD control and end the Gang Database.  In Rachlin's own words:

> "For decades, many New York neighborhoods have battled the same issues – gun violence, underresourced schools, food apartheid, lack of employment opportunities and more. Instead of strategically and intentionally investing in communities, the city of New York has invested huge amounts of money into over-policing and public safety approaches that are not working."

**Charm:**   Rachlin looks for opportunities to pose with officers for photos. Rachlin also uses feminine charm to gain the trust of unsuspecting officers to advance her criminal activities. Rachlin coaches and lobbies for the protection of known gang members.

**Criminality:**   Rachlin seduces police officers to gain access to NYPD databases.  As friends with officers like Capt. Derby St. Fort, Rachlin has gained access to the Gang Database and shared information with known gang members resulting in a surplus of avoidable crime.

Rachlin falsely pressed charges that on October 23, 2018, a "black" man visiting from the State of Georgia engaged in sexual advances at the Wythe Hotel, at 80 Wythe Ave, Brooklyn, NY 11249.  Det. Weber from Special Victims Unit investigated the claim and closed the case after surveillance footage of the hotel revealed that Rachlin was the one making unsolicited advances onto the innocent man, including stalking, groping and pushing herself onto the man. Given Rachlin's gamesmanship bullying the NYPD, the Special Victims Unit closed the case without any charges against Rachlin.

On January 10, 2021, a member of NYC Together, a known gang member, ███████████, was neutralized at the Linden Houses while in possession of a loaded firearm and threatening the safety of others. Rachlin unduly influenced the Borough Commander to omit flagging the January 10 incident as "gang member" related.  Rachlin then went on Twitter to accuse the NYPD of "state & racism" and mourning that "Today I received news that One [sic] of my students was murdered."

2022-056-18962

**EXHIBIT 2, Page 1 of 1**

**PLAINTIFF VERIFICATION**

I, DANA RACHLIN, affirm the following to be true under the penalties of perjury:

1.      I am over 18 years of age.

2.      I am the Plaintiff in the above action, *Rachlin v City of New York, et al.*

3.      I am a resident of Kings County, City and State of New York.

4.      I have read the annexed SECOND AMENDED COMPLAINT and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true.

Dated: ___04/06/2026___          Signed: *Dana Rachlin*

DANA RACHLIN

STATE OF NEW YORK          )

                                              SS.

COUNTY OF KINGS          )

On the ___06___ day of ___April___ in the year 2026, before me, the undersigned notary public, personally appeared ___Dana Rachlin___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged to me that they are the person intended to execute the instrument. This individual executed the instrument in my presence while I was operating within my capacity as a New York State notary and electronic notary.

Notarized online using audio-video communication

Maryanne K Kaishian
Online Notary Public
State of New York
Kings County
Commission #: 02KA0015799
Commission Expires: 11/07/2027

Notary Public