UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DANA RACHLIN,

    Plaintiff,

-against-

THE CITY OF NEW YORK, MAYOR OF
THE CITY OF NEW YORK ERIC ADAMS,
NYPD CHIEF OF DEPARTMENT
JEFFREY MADDREY, NYPD
COMMUNITY COORDINATOR BRIAN
ADAMS, NYPD CHIEF OF PATROL
JOHN CHELL, NYPD INSPECTOR
CRAIG EDELMAN, NYPD DEPUTY
COMMISSIONER KAZ DAUGHTRY,
AND NYPD MEMBERS JOHN OR JANE
DOE # 1 – 5,

    Defendants.

**MEMORANDUM AND ORDER**
Case No. 24-CV-2626 (FB) (SDE)

*Appearances:*

*For the Plaintiff:*
CALLEN LOWELL
SAYED MASOUD MORTAZAVI
MARANNE K. KAISHIAN
Kaishian & Mortazavi LLC
55 Washington Street
Suite 461
Brooklyn, NY 11201

*For the Defendants*
BELINA ANDERSON
JEFFREY S. DANTOWITZ
New York City Law Department
100 Church Street
New York, NY 10007

**BLOCK, Senior District Judge:**

Plaintiff Dana Rachlin sues New York City, former Mayor Eric Adams, and members of

the New York Police Department ("NYPD") for assorted § 1983 violations, state-law

defamation, violations of the New York City Human Right Law ("NYCHRL") and New York

City's Gender Motivated-Violence Act ("GMVA"). The case arises from NYPD officials' alleged

leaking of personal information about a sexual assault Rachlin reported to the NYPD in 2017. Rachlin claims that NYPD officials disseminated false information about her rape to stop her from organizing young and marginalized New Yorkers against violent policing tactics.

Currently before the Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6). For the following reasons, the motion is **GRANTED** in part and **DENIED** in part.

## I.

The following facts are drawn from Plaintiff's Second Amended Complaint ("SAC"). ECF No. 42. Dana Rachlin is the Executive Director of NYC Together, a foundation that provides support services to young people facing increased risks of violence due to poverty. SAC ¶ 31. She is also employed as the Associate Director of Precinct & Community Initiatives at John Jay College's Punishment to Public Health Department. *Id*. Between 2016 and 2021, Rachlin worked with NYPD officials to build community trust and reduce violent encounters between police and citizens in New York City. *Id.* at ¶ 33.

On or about October 17, 2017, Rachlin was sexually assaulted after a party attended by multiple NYPD officials, including Defendants Jeffrey Maddrey and Kaz Daughtry. *Id.* at ¶ 34. Her assailant was not a police officer. *Id.* Rachlin tried to contact Maddrey but reached Daughtry who was then serving as Maddrey's assistant. *Id.* at ¶ 35. She asked Daughtry to tell Maddrey that she urgently needed to talk to him. *Id.* at ¶ 36. Maddrey met Rachlin at the hospital, encouraged her to file a police report, and assured her that her report would be filed pseudonymously to protect her identity. *Id.* at ¶¶ 39–41. He also assured her that only Defendant Daughtry and two NYPD Special Victims Unit ("SVU") detectives would handle the investigation. *Id.* at ¶ 41. Rachlin's rape kit was consistent with sexual assault, and she had

2

visible injuries on her neck. *Id.* at ¶ 42–43. At least one witness also informed the NYPD that they had heard Rachlin's assailant apologize for "what happened last night." *Id.* at ¶ 44.

The day after her assault, Rachlin sat down with two SVU members to conduct a controlled call with her assailant. *Id.* at ¶ 46. During this call the assailant repeatedly apologized and acknowledged that Rachlin did not consent to any sexual acts. *Id.* at ¶ 47. While she was initially led to believe that this call provided sufficient evidence for a criminal case, the Brooklyn DA's office subsequently decided that the call had ended prematurely. *Id.* at ¶ 50. Rachlin was told that to pursue charges, she would need to cooperate with officers to collect more evidence. *Id.* at ¶ 51. She decided to drop the charges rather than continuing with this lengthy and traumatizing process. *Id.* at ¶ 53. The NYPD's case file indicates that the case was closed at her request. *Id.* at ¶ 54–56.

In 2020, Rachlin and the late Michael K. Williams founded We Build the Block as a subsidiary of NYC Together. *Id.* at ¶ 59. They also founded Crew Count, which aimed to respond to the NYPD's gang policing initiative, Operation Crew Cut, with voter registration for young and marginalized New Yorkers. *Id.* at ¶ 60. Through these projects, Rachlin sought to leverage her relationship with the NYPD to prevent officers with histories of violent conduct from interacting with young community members. *Id.* at ¶ 61. One such officer was Defendant Craig Edelman, then Commander of the 73rd Precinct (Brownsville, Brooklyn), who Rachlin identified as particularly indifferent to violence perpetrated by officers under his command. *Id.* at ¶¶ 62–65. Rachlin repeatedly reported Edelman to his superiors and was concerned about his consistent support in the Department. *Id.* at ¶ 66.

On June 5, 2020, then-Commissioner of the NYPD Dermot Shea was scheduled to appear on the radio show Ebro in the Morning hosted by Ebro Darden. *Id.* at ¶ 69. Rachlin contacted

Darden and encouraged him to question Commissioner Shea about Edelman's conduct and leadership position in the 73rd Precinct. *Id.* at ¶ 71. Darden questioned the Commissioner about Edelman, and after the interview Edelman was immediately reassigned. *Id.* at ¶¶ 72–73. He was replaced by Deputy Inspector Terrell Anderson, a well-known proponent of community-led policing. *Id.*

NYPD leadership apparently knew that Rachlin was responsible for this line of questioning because Maddrey texted her, "The minute Ebro [Darden] asked about Edelman, everyone spoke your name. That wasn't a good move." *Id.* at ¶ 76. The same day as the Darden interview, Defendants, including Maddrey and Daughtry, held a meeting where NYPD leadership instructed precinct commanders not to allow Rachlin to enter NYPD precincts or to continue her work in their jurisdictions. *Id.* at ¶ 77.

Later in June 2020, Defendant John Chell had a subordinate communicate to Rachlin that "[the NYPD] can humiliate [you] at any time." *Id.* at ¶¶ 78–79. Rachlin was unsure what Chell meant but understood he intended to harm her reputation if she continued creating trouble for the NYPD. *Id.* at ¶ 80. Because of Chell's threat, and the precinct commanders' restrictions on her access to public locations, Rachlin shifted her community organizing efforts from Brownsville to Sheepshead Bay, in the 61st Precinct, where her efforts found support from NYPD Captain Derby St. Fort. *Id.* at ¶¶ 81–85.

On April 8, 2021, Reverend Kevin McCall requested a meeting with Rachlin, which Rachlin accepted assuming that McCall wanted to discuss community initiatives. *Id.* at ¶¶ 90–91. Instead, McCall told her he had been informed by various Defendants that Rachlin had fabricated her sexual assault to falsely accuse a Black man of rape. *Id.* at ¶¶ 92–94. These Defendants had also told McCall that the case was closed because Rachlin was proven to have invented the story,

4

and that Defendant Chell had conducted the controlled call. *Id.* at ¶¶ 95–96. Rachlin divulged her version of events to correct the record. *Id.* at ¶ 98. She had to repeat this difficult conversation several times over the next two years as Defendants continued to relay this false narrative about her rape to an unknown number of other individuals. *Id.* at ¶ 99. These claims were disseminated to various individuals upon whom Rachlin's professional work relied, including employees with the Center for Justice Innovation ("CJI"), Brownsville In, Violence Out ("BIVO"), and various elected officials. *Id.* at ¶¶ 101–102.

After the conversation with Rev. McCall, Rachlin contacted Defendant Maddrey. *Id*. at ¶ 103. Given his first-hand knowledge of her 2017 rape, she sought his support to stop this whisper campaign. *Id.* at ¶ 105. Defendant Maddrey recognized the veracity of her assault claim and acknowledged, "You absolutely were not making false allegations." *Id*. at ¶¶ 107–108. He promised to speak to Defendant Chell and others, and a few days later he texted Rachlin, "I spoke to everyone on my side, there will be no further issues." *Id*. at ¶¶ 109–110.

Unfortunately, there were further issues. On February 2, 2022, the *New York Times* published an article praising We Build the Block and Captain St. Fort's efforts to use community-based policing in the 61st Precinct. *Id.* at ¶¶ 112–114. In response to this article, on or about February 22, 2022, a two-page letter signed "on behalf of the hardworking members of the NYPD 61st Precinct" was sent to elected officials, community leaders, and religious leaders. *Id.* at ¶¶ 115, 118, 119; SAC Ex. 1, ECF No. 42. The letter was also distributed to NYPD property lockers located in areas restricted to NYPD personnel. *Id.* at ¶¶ 116–117. The letter accused Rachlin of falsely reporting her rape and claimed that this information was verified by NYPD records. *Id.* at ¶¶ 122–124.

5

On or about April 15, 2022, a second letter was received via mail by multiple individuals including members of the NYPD. *Id.* at ¶ 126; SAC Ex. 2. This letter was drafted to look like a specific type of internal NYPD memo (a "49 Memo") and was titled "Beware of the Wolf in Sheep's Clothing: The Racist Branding Police Officers as Racist." *Id.* at ¶¶ 127–128. This "memo" repeated the claims Rachlin had first heard from McCall, namely that she was a racist who had falsely accused a Black man of raping her and that the NYPD had closed the case after proving that she had invented her story. *Id.* at ¶ 129. This second letter included Rachlin's home address and listed her as "affiliated" with NYC Together, We Build the Block, and Crew Count. *Id.* at ¶ 132. It also accused her of using "feminine charm" and sex to extract information from NYPD officers for criminal purposes. *Id.* at ¶ 133.

Rachlin does not know who wrote the letter or the memo, nor which officers spread rumors about her sexual assault. Through Freedom of Information Law ("FOIL") disclosures, she has discovered interdepartmental text messages revealing that Defendants Edelman, Chauncy Parker, and Brian Adams had discussed a social media post of Rachlin's which was also criticized in the April 15, 2022, letter. *Id.* at ¶¶ 136–137. Those same FOIL disclosures revealed that Defendant Brian Adams also exchanged text messages with Rev. McCall about Rachlin. *Id.* at ¶ 138.

## II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). A claim is facially plausible when it "pleads factual content that allows the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The pleading must offer more than "bare assertions," "conclusory" allegations, and a "formulaic recitation of the elements of a cause of action." *Id.* In reviewing a motion to dismiss, the court accepts as true all well-pled factual allegations and draws all reasonable inferences in the nonmoving party's favor. *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).[1]

This case contains claims under federal and state law. The Court will first analyze the federal claims before determining whether to exercise supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367 (courts "shall" have supplemental jurisdiction over state law claims that "form part of the same case or controversy," except in certain exceptional cases, *see* § 1367(c)).

*Violation of the Right to Privacy*

Rachlin's eighth claim, alleging violation of her constitutional right to privacy, will be considered first because it is the underlying constitutional basis for all her § 1983 claims. The SAC alleges that Rachlin shared deeply personal information with the NYPD so that they could bring her assailant to justice, but that Defendant Officers instead weaponized this information to sully her reputation.

The Supreme Court has recognized that "one aspect of the liberty protected by the Due Process Clause of the Fourteenth Amendment in a right of privacy." *Carey v. Population Services International*, 431 U.S. 678, 684 (1977). The exact boundaries of this right have never been clearly delineated, but it has been recognized that "the right to confidentiality encompasses

---

[1] Throughout this opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

7

protection against the public dissemination of details of a sexual assault." *Nassau Cnty. Emple. "L" v. Cnty. of Nassau*, 345 F. Supp. 2d 293, 302 (E.D.N.Y. 2004).

Defendants argue that dissemination of false statements about Rachlin's rape, while possibly defamatory, cannot amount to a violation of her right to confidentiality. *See* Def. Rep. Mem. at 8–9. Specifically, they contend that Rachlin's privacy interest in the contents of her police report was not violated if the shared statements were untrue.

It makes sense that one would not have a privacy interest in untrue statements, but here the statements were swaddled in truth to obscure their falsehoods. Whoever leaked the information about Rachlin's rape included *true* details—*e.g.*, the race of her assailant, the assault's timing and background, that she filed a police report—to make it clear to Rachlin and others that the defamatory statements were rooted in reality. Consequently, Rachlin repeatedly divulged her painful version of events to correct the record. In the nascent stages of litigation, the dissemination of these details about Rachlin's sexual assault supports a claim for the violation of her constitutional right to privacy. Defendants' motion is denied as to Rachlin's eighth claim.

*Stigma-Plus Defamation*

Rachlin's first claim is for stigma-plus defamation, which she raises against Defendants Maddrey, Chell, Daughtry, Edelman, and Does # 1–5. In order to state a Federal claim for defamation, a plaintiff must allege "(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (Sotomayor, J.) (explaining the stigma-plus standard). The stigma and the plus must also be temporally and causally related

8

such that they "would, to a reasonable observer, appear connected - for example, due to their order of occurrence." *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005).

To establish defamation the plaintiff "must show that the statements complained of were false; that they stigmatized the plaintiffs; and that they were publicized." *Abramson v. Pataki*, 278 F.3d 93, 101–102 (2d Cir. 2002). Here, the SAC plausibly alleges that false statements were spread, by mouth and in print, about Rachlin's sexual assault and that these lies were intended to stigmatize her as a racist and a liar. The Court has no trouble concluding that the Complaint adequately states a claim for defamation, but the evidence for a "plus" is not nearly so robust.

The nature of a stigma plus claim is that the Constitution is only implicated when there is stigma *plus* something else, that is to say a loss of reputation coupled with some other tangible element." *Morris v. Lindau*, 196 F.3d 102, 114 (2d Cir. 1999). This other element, the plus, must be "a specific and adverse action clearly restricting the plaintiff's liberty - for example, the loss of employment." *Velez*, 401 F.3d at 87–88. Rachlin alleges a long list of supposed interests that she was deprived of, but most of the list is comprised of the results of stigmatization—e.g., "professional opportunities," "reputation," "relationships with community partners," or "reduced funding"—which do not evidence the deprivation of a liberty or property interest. SAC ¶ 175; *see Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) ("[D]eleterious effects [flowing] directly from a sullied reputation," standing alone, do not constitute a "plus" under the "stigma plus" doctrine.).

The one close call is the allegation that because of Defendants' defamatory statements Rachlin lost "the right to enter the area encompassed by the 73rd Precinct, including the entire neighborhood of Brownsville, Brookyln without fear of reprisal." SAC ¶ 175. Absent a compelling government interest, the right to enter public spaces is clearly a liberty interest

9

protected by the Constitution. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (The rights of the state to limit expressive activity in traditional public spaces are sharply circumscribed.). However, the order to exclude Rachlin from the Precinct's area originated during the June 5, 2020, meeting of Precinct Commanders, *see* SAC ¶ 77, and the defamatory statements did not surface until April 8, 2021. *Id.* at ¶¶ 91–102. This temporal and causal gap renders the theory implausible. Therefore, while the SAC may allege a deprivation of Rachlin's liberty interest in accessing the 73rd Precinct, it fails to demonstrate any relationship between that deprivation and Defendants' defamatory statements. Lacking any other plausible liberty or property interest, her stigma plus claim fails as a matter of law. Defendants' motion is granted as to Rachlin's first claim.

*Municipal Liability*

Rachlin's second claim is for Municipal Liability, against the City of New York, pursuant to *Monell v. Social Svcs.*, 436 U.S. 658 (1978). "To hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). "The policy or custom used to anchor liability need not be contained in an explicitly adopted rule or regulation." *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992). But, before the actions of subordinate city employees can give rise to § 1983 liability, the pattern must be so manifest as to imply the acquiescence of senior policy-making officials. *Id.* at 871. Indeed, *Monell* expressly prohibits *respondeat superior* liability for municipalities, *Monell*, 436 U.S. at 691, so plaintiffs must demonstrate that "through its deliberate conduct, the municipality was the moving force behind the injury alleged," *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520

10

U.S. 397 (1997). A municipality may be liable for the acts of a single official—but only if that official is someone "whose edicts or acts may fairly be said to represent official policy" for the entire municipality. *Monell*, 436 U.S. at 694; *see Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992) (official must be "high up in the municipal hierarchy").

The SAC alleges that New York City is liable for the officers' violations of Rachlin's rights under three theories: first, a failure to train and/or supervise NYPD members on how to conduct investigations into gender-based violence; second, a failure to investigate and/or discipline NYPD members for misconduct; and third, permitting NYPD members to use "ghost access" to enter sensitive NYPD files.

As for the first theory, the failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to "deliberate indifference" to the rights of those with whom the city employees interact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish "deliberate indifference," a plaintiff must show that: (1) "a policymaker knows to a moral certainty that city employees will confront a particular situation;" (2) "there is a history of employees mishandling the situation;" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992).

The facts alleged in the SAC do not support municipal liability under a failure-to-train theory. There is no suggestion that policymakers knew to a "moral certainty" that police officers would encounter the unique situation in this case, and there is no evidence that failures in NYPD's training were responsible for what transpired. To the contrary, the SAC is most plausibly read as suggesting that some officers violated Department policy and training by publicizing defamatory information about Rachlin's sexual assault.

11

As for the second theory, "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts." *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980). A municipality will not be held liable for a "failure of those in charge to discipline a single police officer for a single incident of illegality"; there must be "more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct." *Id.* at 201–202.

The SAC alleges that private information about Rachlin's sexual assault was leaked by NYPD officials, first, to Rev. McCall, and subsequently to employees of various organizations including CJI and BIVO, and elected officials. SAC ¶¶ 90–102. While it's unclear whether this was the action of a single officer, it is most plausibly seen as a consistent and well-organized smear campaign. After hearing about the lies being spread about her, Rachlin contacted Defendant Maddrey to ask him to put a stop to it. *Id.* at ¶ 103. At this time, he was the NYPD's Chief of Community Affairs and Housing, but in the following years he would be promoted to Chief of Patrol, and subsequently, to Chief of Department. *Id.* at ¶ 7. He was, in other words, part of the elite cadre of officials responsible for leading the Department. During their phone call, Maddrey told her he would stop the rumor mill. *Id.* at ¶¶ 107–110. And yet, he either did nothing or failed to stop the illegal actions of his subordinates. And in 2022, once Maddrey was on notice, the situation only worsened with the publication of two defamatory letters sent to an unknown number of NYPD officials, community leaders, and elected officials. *Id.* at ¶¶ 115–135.

The complaint thus alleges that Maddrey, as part of the highest level of leadership in the NYPD, was on notice that officers were engaging in serious malfeasance and yet failed to take meaningful remedial action. While at this stage it is unclear if the early rumors were spread by

12

one officer or more, it was not an isolated incident. Furthermore, after Madrey was put on notice, the spreading of lies about Rachlin increased and evidently came to involve more officers. *See e.g.* SAC Ex. 1 (defamatory letter written "on behalf of the hardworking members of the NYPD 61st Precinct"). These allegations could suggest that leadership within the NYPD was either deliberately indifferent toward, or tacitly approved, the actions of these officers. As the Court has already determined that the SAC plausibly alleges that these actions violated Rachlin's constitutional right to privacy, the SAC also plausibly alleges that the City may be liable under *Monell* for those violations.

Rachlin's final *Monell* theory is that the NYPD has an official policy of allowing members to access internal and sensitive files with "ghost access" whereby there is no record of their having accessed said files. She further claims that because of this ghost access policy, the access log on her investigative file is incomplete, such that an unknown number of unknown NYPD members accessed her file. She argues that ghost access is responsible for the violation of her constitutional right to privacy.

Defendants respond only by reiterating their previous arguments regarding the right to privacy. As the Court has already found that the SAC adequately pleads a violation of this right, Defendants' arguments fail to undermine Rachlin's third *Monell* liability theory. While the Court is unsure how Plaintiff will prove causation under this theory, as Defendants did not raise the issue, the Court can only conclude that the SAC plausibly pleads a "ghost access" theory for *Monell* liability as well.

Defendants' motion is therefore denied as to failure to punish and the ghost access theories of *Monell* liability but granted as to the failure to train theory.

*First Amendment Retaliation*

13

Rachlin's third claim, First Amendment retaliation, is raised against all the individual NYPD Defendants. To plead a First Amendment retaliation claim a plaintiff must show "(1) [she] has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [her] exercise of that right; and (3) the defendant's actions caused [her] some injury." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). Walking through these elements, the SAC alleges that Rachlin regularly engaged in speech protected by the First Amendment; namely, speech critical of the NYPD and its policies. The SAC also plausibly alleges that because of her speech, certain members of the NYPD engaged in a targeted campaign to smear her as a liar and a racist.

Defendants argue that this claim should be dismissed against Defendants Eric Adams, Edelman, and Daughtry because the Complaint failed to allege any defamatory statements made by these Defendants. Def's MOL, 12, ECF. No. 39-1. Mayor Eric Adams was not a member of the NYPD during the time at issue. *See* SAC ¶ 6 ("[Adams] was at all times relevant to this complaint the Mayor of New York City"). As the claim for Retaliation is pled only against "individual NYPD Defendants," it does not apply to Mayor Adams. Because the Complaint does not state a claim for retaliation against him, the Court need not address Defendants' argument.

The involvement of Edelman and Daughtry, on the other hand, is plausibly inferred from the facts that the retaliation was in response to Edelman's transfer, SAC ¶¶ 66–80, and that Daughtry was the lead detective charged with investigating the 2017 sexual assault which formed the basis of the retaliatory conduct. *Id.* at ¶¶ 34–41. These facts are sufficient to render the claim that they played a role in the retaliation plausible.

As to the final element of the retaliation claim, the SAC states in a conclusory manner that Rachlin's speech was "chilled" by Defendants' conduct. SAC ¶¶ 82, 152, 260. However, at

14

no point does the SAC allege that Rachlin stopped speaking against police violence or altered her speech. Based on this deficiency, Defendants argue that Rachlin's First Amendment retaliation claim fails because there is no evidence that her speech was chilled. *See* Def's Rep. Mem. at 5, ECF No. 39-3. In other words, Defendants argue that because they were unsuccessful in their efforts to silence Rachlin, she has no recourse.

While "chilled speech" is the typical injury of First Amendment retaliation, it is "not the *sine qua non* of a First Amendment claim. A plaintiff has standing if [she] can show either that [her] speech has been adversely affected by the government retaliation or *that [she] has suffered some other concrete harm*." *Dorsett*, 732 F.3d at 160 (emphasis added). This Circuit has recognized a non-exclusive list of other non-speech related harms that are sufficient to give a plaintiff standing. *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) (lost government contract); *Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (additional scrutiny at border crossing); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) (revoking a building permit); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (refusal to enforce zoning laws).

Rachlin has alleged a claim for First Amendment retaliation because (i) she had a protected first amendment interest in her right to criticize the NYPD, (ii) the Defendants were motivated by their desire to silence and punish her, and (iii) their actions violated her constitutional right to privacy. Defendants' motion to dismiss the First Amendment retaliation claim is denied.

*Failure to Intervene*

Rachlin's fourth claim is that all Individual Defendants are liable for failing to intervene to stop the violation of her constitutional rights. The Second Circuit has recognized that a "police

15

officer is under a duty to intercede and prevent fellow officers from subjecting a citizen to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016). Liability attaches based on the theory that by failing to intervene, the officer becomes a "tacit collaborator" in the illegality. *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988). "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

This theory has been applied in instances of excessive force, *see O'Neill*, 839 F.2d at 11–12, and illegal arrest, *see Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir. 1982). As the Seventh Circuit summarized the duty in *Byrd v. Brishke,* "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." 466 F.2d 6, 11 (7th Cir. 1972). The Court sees no reason why this logic would not apply to the present facts. The Complaint alleges that certain Individual Defendants violated Rachlin's constitutional interest in the privacy of her sexual assault report to punish her for her criticism of the Department. It also alleges that Maddrey knew about these violations after the April 8 phone call, and that he failed to make his fellow officers stop the smear campaign for more than a year.

Discovery may reveal that Maddrey, or others, attempted to stop the abuse, or that they had no real opportunity to do so. If so, they would have fulfilled their duty to intervene. But in this current stage of litigation the Court concludes that the SAC plausibly alleges that certain Defendants failed to intervene to stop the punishment that other officers were unlawfully imposing on Rachlin. Defendants' motion is therefore denied as to the fourth claim.

16

**III**

Having determined that certain federal claims survive, the Court now turns to Rachlin's state law claims for (1) protection from gender-based violence under the GMVA, (2) unlawful discrimination under the NYCHRL, and (3) state-law defamation. As explained below, Plaintiff's state law claims all fail.

*Protection from gender-based violence*

The SAC's fifth claim is for protection from gender-based violence under the GMVA, NYC Admin. Code § 10-1102, *et seq.*, which provides a civil cause of action for victims of crimes of violence motivated by gender. The law defines a crime of violence as "an act or series of acts that would constitute a misdemeanor or felony against the person as defined in state or federal law . . . if the conduct presents a serious risk of physical injury to another." § 10-1103. The only theory Rachlin offers for why Defendants' alleged conduct would present a serious risk of physical injury is that by publishing her home address in the mock "49 Memo," *see* SAC ¶ 276, they subjected her to a risk of injury. She provides no case law to support the leap that the publication of one's home address is a *per se* threat to safety. Without more—like a threat, or other threatening context—the Court cannot say that the publication of Rachlin's home address, while inappropriate, is a "crime of violence." The GMVA was passed to revive previously time-barred claims for crimes of violence motivated by gender, namely sexual assaults. *See S.S. v. Rockefeller Univ. Hosp.*, 239 A.D.3d 424, 426 (App. Div. 1st Dept.); § 10-1105 (revival provision). The present case does not fall under that umbrella. The SAC's fifth claim is therefore dismissed with prejudice.

*Unlawful Discrimination and/or Retaliation*

17

Rachlin's sixth claim is for unlawful discrimination and/or retaliation in violation of the New York City Human Rights Law ("NYCHRL"). NYC Admin. Code § 8-102, et seq., and § 8-502. The NYCHRL outlaws unlawful discrimination and retaliation by "place[s and providers] of public accommodation" which are "generally open to all comers." *Matter of Cahill v Rosa*, 89 NY2d 14, 21 (1996); *see also id.* at 20 (noting that the definition of services under the NYCHRL "should be interpreted liberally").

Assuming, *arguendo*, that the NYPD are covered by the NYCHRL, Rachlin's claim still fails because she has not plausibly alleged actionable discrimination. Rachlin alleges that she was denied access to "public areas in Kings County and spaces expressly designated as open to public access within NYPD precincts" based on her status as the victim of a sex offense. However, as with her Stigma plus argument, the timeline of the SAC undermines the plausibility of this theory. Once again, the order to exclude Rachlin from the Precinct's area originated during the June 5, 2020, meeting of Precinct Commanders, *see* SAC ¶ 77, and the defamatory statements did not surface until April 8, 2021. *Id.* at ¶¶ 91–102. Therefore there is no causal connection between the denial of her access to public accommodations and her status as a victim of a sex offense. The SAC's sixth claim is dismissed with prejudice.

*State-law Defamation*

Rachlin's seventh claim is for New York state law defamation against the individual Defendants and against the City based on *respondeat superior*. However, this claim must be dismissed for two reasons: (1) she failed to serve a notice-of-claim on the City; (2) in any event, the statute of limitations had expired. *See Scantlebury v. N.Y. City Health & Hosps. Corp.*, 4 N.Y.3d 606, fn 3 (2005) (notice-of-claim is a condition precedent to lawsuit against City and its employees); Gen. Mun. Law 50-i(1)(c) (one-year-and-ninety-days statute of limitation for claims

18

against municipalities and any of their officers, agents or employees). Rachlin's seventh claim is dismissed with prejudice.

### Conclusion

Defendants' motion is DENIED as to Plaintiff's Second, Third, Fourth, and Eighth Claims, and GRANTED as to Plaintiff's Second, Fifth and Sixth, and Seventh Claims.

**SO ORDERED.**

    /S/ Frederic Block       
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
July 20, 2026